UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No.: 11-00945 (ABJ) |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, | ) ) ) | |
| Defendant. | ) ) ) | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The Electronic Privacy Information Center (EPIC) brings this action under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, regarding the United States Department of Homeland Security's (DHS) response to a FOIA request submitted by letter dated November 24, 2010.  Specifically, EPIC challenges DHS's invocation of FOIA Exemptions 3, 4, 5 and 6 to withhold contract proposals and confidential information submitted by third parties; information generated as part of deliberations by the agency; and telephone numbers, email addresses and signatures of private individuals and government employees.

As there are no material facts in dispute, DHS moves under Fed. R. Civ. P. 56 for summary judgment.  DHS submits that the attached memorandum of points and authorities, statement of material facts not in genuine dispute, and supporting declarations and exhibits thereto establish that it is entitled to summary judgment.

Respectfully submitted,

RONALD C. MACHEN JR., D.C. Bar #447889
United States Attorney

RUDOLPH CONTRERAS, D.C. Bar #434122
Chief, Civil Division

By: ___/s/_____
JAVIER M. GUZMAN, D.C. Bar #462679
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530
Tel: (202) 616-1761
Fax: (202) 514-8780
Javier.Guzman2@usdoj.gov

*Of counsel:*
Marshall L. Caggiano, Esq.
Office of General Counsel
Science & Technology Directorate
Department of Homeland Security

2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No.: 11-00945 (ABJ) |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, | ) ) ) | |
| Defendant. | ) ) ) | |

**DEFENDANT'S STATEMENT OF MATERIAL FACTS
NOT IN GENUINE DISPUTE**

Defendant, per Local Civil Rule 7(h), submits that the following material facts are not in genuine dispute.

1.      The Homeland Security Advanced Research Projects Agency (HSARPA) is the external funding arm for the Department of Homeland Security Science and Technology Directorate (S&T).  *See* HSARPA, Prototype and Technology for Improvised Explosives Device Detection, Broad Area Announcement (BAA) 05-03, at 3 (Dec. 21, 2004) (attached hereto as Ex. 1).  HSARPA invests in programs offering the potential for cutting-edge changes in technologies that promote homeland security by, in part, awarding procurement contracts for research or prototypes to public and private entities, businesses and universities.  *Id.*

2.      In the wake of several overseas bombings of mass transit systems in the early and mid-2000s, HSARPA issued BAA 05-03, announcing the creation of the Prototypes and Technology for Improvised Explosives Device Detection (PTIEDD) Program.  BAA 05-03;

Declaration of Rebecca Medina, ¶ 3 (attached hereto as Ex. 2).[1]  The program's goals were to develop and improve existing systems capable of detecting explosive compounds in vehicles; and to support research and development of next generation technologies for detecting improvised explosive devices in vehicles, leave-behind packages, or carried by suicide bombers. BAA 05-03 at 3; Medina Decl., ¶ 3.  BAA 05-03 invited interested parties to submit proposals for developing working prototypes of explosive detection devices and novel technologies and devices that would advance the state of the art.  BAA 5-03 at 3.

3.      Bidders were required to register and submit proposals online at a password-protected website.  BAA 05-03 at 8-9; Medina Decl., ¶ 4.  All data uploaded to the website was protected from public view or download and could only be reviewed by the submitter, authorized government representatives, support contractors and assigned evaluators who had signed appropriate non-disclosure agreements.  *Id.*  Furthermore, all submissions were considered proprietary/source selection sensitive.  *Id.*

4.      On May 19, 2006, HSARPA issued an amendment to BAA 05-03 inviting submissions for a prototype electro-imaging device capable of detecting concealed explosives, explosive devices, and other weapons at a minimum standoff distance.  Amendment to BAA 05-03 (May 19, 2006) (attached hereto as Ex. 3).[2]  Like submissions under original BAA 05-03, submissions under the amendment were made to a secure website, were considered proprietary/source selection sensitive, and were reviewed by a discrete set of individuals who had signed appropriate non-disclosure agreements.  *Id.* at 4, 8-9.

---

[1] Ms. Medina is a senior policy advisor in the Explosives Division (EXD) within DHS/S&T.  She is familiar with EXD past and present projects and supervised the processing of the FOIA request at issue.  *Id.*, ¶¶ 1-2.

[2] Standoff detection is a method of explosives detection meant to reduce the risk of travel system inefficiencies where constant movement of large numbers of people and vehicles are involved. *See* Medina Decl., ¶ 6.

5.      Under BAA 05-03, HSARPA awarded two contracts: to Northeastern University (NEU) to assess the state of the art in explosives detection technology and its adaptability to mass transit scenarios, and to Rapiscan, Inc. to explore how its portal-based detector system might be adapted for stand-off detection in mass transit threat scenarios.  Medina Decl., ¶¶ 5-6.

6.      The contracts ended in 2008 and EXD, having succeeded HSARPA in managing the PTIEDD program, decided to terminate it.  Medina Decl., ¶ 7.

7.      On November 24, 2010, Plaintiff, the Electronic Privacy Information Center (EPIC), submitted a request under the Freedom of Information Act, 5 U.S.C. § 552 (FOIA), to DHS seeking certain records pertaining to DHS's activities in developing and using explosives detection systems.  Specifically, Plaintiff sought seven categories of records:

    a.    "All documents detailing plans by federal law enforcement agencies to implement body scanner technology in the surface transportation context."

    b.    "All contracts, proposals, and communications with private transportation and shipping companies (including, but not limited to NJ PATH, Amtrak, and Greyhound) regarding the implementation of body scanner technology in surface transit."

    c.    "All contracts, proposals, and communications with states, localities, tribes, and territories (and their subsidiaries or agencies) regarding the implementation of body scanners in surface transportation."

    d.    "All documents detailing plans by federal law enforcement agencies to use 'Z Backscatter Vans" or similar technology."

    e.    "All contracts, proposals, and communications with states, localities, tribes, and territories (and their subsidiaries or agencies) regarding the implementation of 'Z Backscatter Vans' or similar technology."

    f.    "All images generated by the 'Z Backscatter Vans' or body scanner technology that has been used in surface transit systems."

Compl., ¶ 16; Medina Decl., ¶ 8.

8.      The request was referred to S&T Executive Secretary office, which in turn assigned the request to EXD, specifically, Ms. Medina, for processing.  Medina Decl., ¶¶ 8-10. EXD was the only division to possess records potentially responsive to the request because it dealt with detection of explosives and had conducted research on Z Backscatter Vans and body scanner technology.  *Id.*, ¶ 10. [3]  Additionally, the HSARPA employee who had overseen explosives detection research, Dr. Mike Shepherd, had been subsequently reassigned to EXD as part of a reorganization of S&T and had brought his files with him.  *Id.*

9.      Ms. Medina forwarded the request to the five employees in EXD, including Dr. Shepherd, who work on issues related to standoff detection or mass transit security and asked them whether they were involved in any programs in which Whole Body Imaging, Advanced Imaging Technology, Millimeter Wave, or Backscatter technologies were being implemented as a detection option in the mass transit context.  Medina Decl., ¶ 11.  Two employees replied affirmatively and three replied negatively.  *Id.*  Ms. Medina then directed the two employees who replied affirmatively, both of them program managers, to search all paper and electronic files, including emails, for the projects they had.  *Id.*, ¶ 12.

10.     EXD files, both paper and electronic, are kept by the managers for each program. Paper files are stored in file cabinets or binders by project.  Medina Decl., ¶ 12.  Electronic files are stored on each program manager's location on the network drive, typically in master folders for each project.  *Id.*  Emails are stored in these master folders or electronic in-boxes.  Older emails are stored in archived locations.  *Id.*

11.     The program managers searched the cabinets and binders for responsive records in paper form.  Medina Decl., ¶ 13.  As to the electronic search, they searched the network drive

---

[3] Backscatter scanning is an advanced X-ray imaging technology capable of being used to detect hidden explosives and weapons on transit passengers.  *Id.*, ¶ 5.

master folders, email, and email archives using the following search terms to retrieve potentially

responsive records:  "Whole Body Imager," "Advanced Imaging Technology," "Millimeter

Wave," "Backscatter," and "Z-Backscatter Van."  *Id.*  This search was completed within two

weeks of Ms. Medina's request.  *Id.*

12.     The EXD staff identified 21 records, comprising approximately 1,100 pages of

records, as potentially responsive.  Medina Decl., ¶ 14.  Ms. Medina independently reviewed the

records with respect to responsiveness and forwarded them to S&T's Office of General Counsel

to determine whether the documents were subject to any of the FOIA disclosure exemptions and

to Exec Sec for processing and release to EPIC of all responsive, non-exempt records.  *Id.*

Another record, which was initially identified as responsive, was upon further review determined

not to be responsive to any of the categories in EPIC's FOIA request.  *Id.*, ¶ 15.  Thus, a total of

20 records have been determined to be responsive to the request.

13.     As a result of this process, DHS released 15 pages of records in full and 158

pages in part, and withheld 671 pages in full.  Medina Decl., ¶ 24.  The information withheld was

determined to be protected under FOIA Exemptions 3, 4, 5 and 6.  *Id.*, ¶¶ 15-22; *see Vaughn*

Index (Attachment 1 to the Medina Declaration).[4]

14.     In an effort to narrow the issues for judicial review, DHS, subsequent to the filing

of this action, has further reviewed the records to determine whether any additional non-exempt

information could be reasonably segregated and disclosed.  Medina Decl., ¶ 25.  As a result,

DHS has released three additional records, two that had been withheld in full and one that been

withheld in part.  DHS has also released reasonably segregable information from three additional

---

[4] In *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), the court provided that agencies should
generally prepare an itemized index correlating each withheld document with a specific FOIA
exemption and the agency's justification for non-disclosure.

records withheld in part.  *Id.*  Thus, DHS is presently withholding 17 records in full or in part.
*Id.*

15.     DHS has also determined that it erroneously charged EPIC $7.30 for processing,
*i.e.*, conducting a search and review of the request.  Medina Decl., ¶ 26.  DHS has waived that
charge.  *Id.*

16.     The declaration of Rebecca Medina and accompanying document index set forth
the details of the scope of DHS's search, as well as the grounds for all of DHS's withholding
decisions under the applicable FOIA exemptions.  Defendant also submits the declaration of
Peter Modica, Vice President of Product Line Management for Rapiscan Systems, Inc. (attached
hereto as Exhibit 4), setting forth additional grounds for withholding certain Rapiscan records
under Exemption 4).

Respectfully submitted,

RONALD C. MACHEN JR., D.C. Bar #447889
United States Attorney

RUDOLPH CONTRERAS, D.C. Bar #434122
Chief, Civil Division


By:   ___/s/_____
JAVIER M. GUZMAN, D.C. Bar #462679
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530
Tel: (202) 616-1761
Fax: (202) 514-8780
Javier.Guzman2@usdoj.gov

*Of counsel:*
Marshall L. Caggiano, Esq.
Office of General Counsel
Science and Technology Directorate
Department of Homeland Security

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No.: 11-00945 (ABJ) |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, | ) ) ) | |
| Defendant. | ) ) ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

The Electronic Privacy Information Center (EPIC) has sued the Department of Homeland Security (DHS) under the Freedom of Information Act (FOIA), 5 U.S.C. § 552 (FOIA), seeking release of records concerning the use of explosives detection systems, known as whole body imaging and backscatter technology, in the mass transit context. Because DHS has conducted an adequate search and produced all responsive documents that are not exempt from release under FOIA, as demonstrated by the declarations and *Vaughn* index submitted herewith, summary judgment should be granted in Defendant's favor.

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.     The PTIEDD Program**

The Homeland Security Advanced Research Projects Agency (HSARPA) is the external funding arm for the DHS Science and Technology Directorate (DHS/S&T). HSARPA invests in programs offering the potential for cutting-edge changes in technologies that promote homeland security by, in part, awarding procurement contracts for research or prototypes to public and

private entities, businesses and universities.  Def.'s Statement of Genuine Facts Not in Material

Dispute (Undisputed Facts), ¶ 1.

In the wake of several overseas bombings of mass transit systems in the early and mid-

2000s, HSARPA in December 2004 issued Broad Agency Announcement 05-03, announcing the

creation of the Prototypes and Technology for Improvised Explosives Device Detection

(PTIEDD) Program.  The program's goals were to develop and improve existing systems capable

of detecting explosive compounds in vehicles; and to support research and development of next

generation technologies for detecting improvised explosive devices in vehicles, leave-behind

packages, or carried by suicide bombers.  BAA 05-03 invited interested parties to submit

proposals for developing working prototypes of explosive detection devices novel technologies

and devices that would advance the state of the art.  In May 2006, HSARPA amended BAA 05-

03 to invite submissions for a prototype electro-imaging device capable of detecting concealed

explosives and weapons.  *Id.*, ¶¶ 2, 4.

DHS assured all bidders that their proposals would be treated with confidentiality.

Bidders were required to register and submit proposals online at a password-protected website.

All data uploaded to the website was protected from public view or download and could only be

reviewed by the submitter, authorized government representatives, support contractors and

assigned evaluators who had signed appropriate non-disclosure agreements.  Furthermore, all

submissions were considered proprietary/source selection sensitive.  *Id.*, ¶ 3.

HSARPA awarded two contracts under BAA 05-03:  to Northeastern University (NEU)

to assess the state of the art in explosives detection technology and its adaptability to mass transit

scenarios, and to Rapiscan, Inc. to explore how its portal-based detector system might be adapted

for standoff detection in mass transit threat scenarios.[1]  The contracts ended in 2008 and S&T's

Explosives Division (EXD), having succeeded HSARPA in managing the PTIEDD program,

decided to terminate it.  *Id.*, ¶¶ 5-6.

## II.     FOIA Request at Issue

On November 24, 2010, EPIC submitted a FOIA request to DHS seeking certain records

pertaining to DHS's activities in developing and using explosives detection systems.

Specifically, Plaintiff sought seven categories of records:

1. "All documents detailing plans by federal law enforcement agencies to implement body scanner technology in the surface transportation context."

2. "All contracts, proposals, and communications with private transportation and shipping companies (including, but not limited to NJ PATH, Amtrak, and Greyhound) regarding the implementation of body scanner technology in surface transit."

3. "All contracts, proposals, and communications with states, localities, tribes, and territories (and their subsidiaries or agencies) regarding the implementation of body scanners in surface transportation."

4. "All documents detailing plans by federal law enforcement agencies to use 'Z Backscatter Vans" or similar technology."

5. "All contracts, proposals, and communications with states, localities, tribes, and territories (and their subsidiaries or agencies) regarding the implementation of 'Z Backscatter Vans' or similar technology."

6. "All images generated by the 'Z Backscatter Vans' or body scanner technology that has been used in surface transit systems." [2]

*Id.*, ¶ 7.

DHS referred the request to the S&T Executive Secretary office, which in turn assigned

the request to EXD because it was the only division to possess records potentially responsive to

---

[1] Standoff detection is a method of explosives detection meant to reduce the risk of travel system inefficiencies where constant movement of large numbers of people and vehicles are involved. *Id.*, ¶ 4 n.2.
[2] Backscatter scanning is an advanced X-ray imaging technology capable of being used to detect hidden explosives and weapons on transit passengers.  *Id.*, ¶ 8 n.3.

the request because it dealt with detection of explosives and had conducted research on Z

Backscatter Vans and body scanner technology.  Additionally, the HSARPA employee who had

overseen explosives detection research, Dr. Mike Shepherd, had been subsequently reassigned to

EXD as part of a reorganization of S&T and had brought his files with him.  *Id.,* ¶ 8.

Rebecca Medina, an EXD Senior Policy Advisor familiar with the division's various

projects, supervised the search and processing of EPIC's request.  Ms. Medina forwarded the

request to the five employees in EXD, including Dr. Shepherd, who work on issues related to

standoff detection or mass transit security and asked them whether they were involved in any

programs in which Whole Body Imaging, Advanced Imaging Technology, Millimeter Wave, or

Backscatter technologies were being implemented as a detection option in the mass transit

context.  Two employees replied affirmative and three replied negatively.  Ms. Medina then

directed the two employees who replied affirmatively, both of them program managers, to search

all paper and electronic files, including emails, for the projects they had.  *Id.*, ¶¶ 8-9.

EXD files, both paper and electronic, are kept by the managers for each program.  Paper

files are stored in file cabinets or binders by project.  Electronic files are stored on each program

manager's location on the network drive, typically in master folders for each project.  *Id.*  Emails

are stored in these master folders or electronic in-boxes.  Older emails are stored in archived

locations.  *Id.*, ¶ 10.

The program managers searched the cabinets and binders for potentially responsive

records in paper form.  They searched the network drive master folders, emails, and email

archives using the following search terms to retrieve potentially responsive records in electronic

form:  "Whole Body Imager," "Advanced Imaging Technology," "Millimeter Wave,"

"Backscatter," and "Z-Backscatter Van." *Id.* This search was completed within two weeks of Ms. Medina's request. *Id.*, ¶ 11.

The EXD staff identified 21 records as potentially responsive to EPIC's request. Ms. Medina independently reviewed the records with respect to responsiveness and forwarded them to S&T's Office of General Counsel to determine whether the documents were subject to any FOIA exemptions and to Exec Sec for processing and release to EPIC of all responsive, non-exempt records. Another record, which was initially identified as responsive, was upon further review determined not to be responsive to any of the categories in EPIC's FOIA request. Thus, a total of 20 records have been determined to be responsive to EPIC's FOIA request. *Id.*, ¶ 12.

As a result of this process, DHS released 15 pages of records in full and 158 pages in part, and withheld 671 pages in full. DHS has invoked FOIA Exemptions 3, 4, 5 and 6 to withhold information. *Id.*, ¶ 13; *see Vaughn* Index (Attachment 1 to Medina Declaration).

In an effort to narrow the issues for judicial review, DHS, subsequent to the filing of this action, has further reviewed the withheld records to determine whether any additional non-exempt information could be reasonably segregated and disclosed. As a result, DHS has released three additional records, two that had been withheld in full one and one that had been withheld in part. DHS has also released reasonably segregable information from three additional records withheld in part. Thus, DHS is presently withholding 17 records in full or in part. *Id.*, ¶ 14.[3]

## LEGAL STANDARD

Summary judgment is appropriate when the pleadings and evidence "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986);

---

[3] DHS has also determined that it erroneously charged EPIC $7.30 for processing, *i.e.*, conducting a search and review of the request. DHS has waived that charge. *Id.*, ¶ 15.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).  The party seeking summary judgment must demonstrate the absence of a genuine issue of material fact.  *See Celotex*, 477 U.S. at 248.  A genuine issue of material fact is one that "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248.  Once the moving party has met its burden, the nonmoving party "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 248.

FOIA cases are typically and appropriately decided on motions for summary judgment. *Citizens for Responsibility & Ethics in Washington (CREW) v. Dep't of Labor*, 478 F. Supp. 2d 77, 80 (D.D.C. 2007); *Wheeler v. Dep't of Justice*, 403 F. Supp. 2d 1, 5-8 (D.D.C. 2005).  An agency is entitled to summary judgment in a FOIA case if it demonstrates (1) that it has conducted an adequate search for responsive records and (2) each responsive record that it has located either has been produced to the plaintiff or is exempt from disclosure.  *See Weisberg v. Dep't of Justice*, 627 F.2d 365, 368 (D.C. Cir. 1980).  To meet its burden, a defendant may rely on reasonably detailed and non-conclusory declarations.  *See McGehee v. CIA*, 697 F.2d 1095, 1102 (D.C. Cir. 1983); *Vaughn v. Rosen*, 484 F.2d 820, 826-27 (D.C. Cir. 1973); *Wheeler*, 403 F. Supp. 2d at 6.

In determining the adequacy of a search, courts are guided by principles of reasonableness.  *Campbell v. Dep't of Justice*, 164 F.3d 20, 27-28 (D.C. Cir. 1998).  The agency must explain the "scope and method of the search" in "reasonable detail[,]" but need not provide "meticulous documentation [of] the details of an epic search."  *Perry v. Block*, 684 F.2d 121, 127 (D.C. Cir. 1982).  The agency must show "that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the

information requested." *Oglesby v. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). "There

is no requirement that an agency search every record system." *Id.* Rather, "the issue to be

resolved is not whether there might exist any other documents possibly responsive to the request,

but rather whether the *search* for those documents was *adequate*." *Weisberg v. Dep't of Justice*,

745 F.2d 1476, 1485 (D.C. Cir. 1984). On this issue, courts accord agency affidavits "a

presumption of good faith, which cannot be rebutted by 'purely speculative claims about the

existence and discoverability of other documents.'" *SafeCard Servs., Inc. v. SEC*, 926 F.2d

1197, 1200 (D.C. Cir. 1991) (quoting *Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771

(D.C. Cir. 1981)). In short, a search's adequacy is measured by the methods employed, not by

the results obtained. *Weisberg*, 745 F.2d at 1485.

   The agency must also justify any records withheld subject to FOIA's statutory

exemptions. FOIA "represents a balance struck by Congress between the public's right to know

and the government's legitimate interest in keeping certain information confidential." *Ctr. for

Nat'l Sec. Studies v. Dep't of Justice*, 331 F.3d 918, 925 (D.C. Cir. 2003). As such, while the

statute "affords the public access to virtually any federal government record that FOIA itself

does not specifically exempt from disclosure," *EPIC v. Dep't of Homeland Sec.*, 384 F. Supp. 2d

100, 106 (D.D.C. 2005), Congress recognized "that legitimate governmental and private interests

could be harmed by release of certain types of information and provided nine specific

exemptions under which disclosure could be refused." *FBI v. Abramson*, 456 U.S. 615, 621

(1982). These exemptions are specified in 5 U.S.C. § 552(b).

   The agency has the burden of justifying nondisclosure based on any exemptions. *EPIC*,

384 F. Supp. 2d at 106. It may meet this burden by providing affidavits and, if necessary, an

index that provides an adequate description of each withheld document or portion thereof, and

how each asserted exemption applies.  *Id.*  "[T]he Court may award summary judgment solely on the basis of information provided by the department or agency in declarations when the declarations describe 'the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'"  *CREW*, 478 F. Supp. 2d at 80 (quoting *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981)).

## ARGUMENT

### I.     DHS CONDUCTED AN ADEQUATE SEARCH FOR RESPONSIVE DOCUMENTS.

As outlined in the attached declaration of Rebecca Medina, Senior Policy Advisor in EXD, DHS conducted an adequate search that was reasonably expected to produce the information requested.  Upon initial receipt of EPIC's FOIA request, which expressly referred to body scanner technology and Z Backscatter Vans, DHS referred the request to EXD, because "as the division that dealt with explosives detection (including body scanner technology and Z Backscatter Vans), it was the only one to possess records responsive to EPIC's FOIA request." Medina Decl., ¶ 10.  Additionally, Dr. Mike Shepherd, the employee who had overseen explosives detection projects, had been reassigned from HSARPA to EXD as part of a reorganization of S&T and had brought his files with him.  *Id.*; *see Hornbostel v. Dep't of Interior*, 305 F. Supp. 2d 21, 26-27 (D.D.C. 2003) (finding search adequate where FOIA request involved discrete project dealt with primarily by one division within agency and scope of search was relevant division employees' electronic and paper records followed by review of retrieved documents by FOIA supervisors).

Ms. Medina forwarded the request to the five employees in EXD, including Dr. Shepherd, who work on issues related to standoff detection or mass transit security and asked them whether they were involved in any programs in which Whole Body Imaging, Advanced Imaging Technology, Millimeter Wave, or Backscatter technologies were being implemented as a detection option in the mass transit context. Medina Decl., ¶ 11. Two employees replied affirmative and three replied negatively. *Id.* She then asked the two employees to search all paper and electronic files, including emails, for the projects they had. *Id.*, ¶ 12.

As explained by Ms. Medina, paper and electronic files are kept by the managers for each program. Paper files are stored in file cabinets or binders by project. Electronic files are stored on each program manager's location on the network drive, typically in master folders for each project. Emails are stored in these master folders or electronic in-boxes. Older emails are stored in archived locations. *Id.*

The two employees, both program managers, searched the cabinets and binders for potentially responsive paper records. *Id.*, ¶ 13. They searched the network drive master folders, emails and email archives using the following search terms to retrieve potentially responsive electronic records: "Whole Body Imager," "Advanced Imaging Technology," "Millimeter Wave," "Backscatter," and "Z-Backscatter Van." *Id.* The search and retrieval were completed within two weeks of Ms. Medina's request. *Id.*

The EXD staff provided 21 records, comprising approximately 1,100 pages of records for review. *Id.*, ¶ 14. Ms. Medina independently reviewed the records to assess their responsiveness to EPIC's request and forwarded them to S&T's Office of General Counsel (OGC) to determine

whether the records were subject to any of the disclosure exemptions under FOIA and to Exec

Sec for processing for release to EPIC of all responsive, non-exempt records.  *Id.*[4]

In sum, DHS searched the only component reasonably likely to have responsive records,

Ms. Medina tasked the most knowledgeable employees to conduct a search, and these employees

searched electronic and paper files and emails for responsive records.  The agency's search was

therefore adequate.  *CREW v. Dep't of Justice*, 535 F. Supp. 2d 157, 162 (D.D.C. 2008) (finding

search adequate where agency explained how "all files likely to contain responsive materials

were searched, by whom they were searched, and in what manner"); *Landmark Legal Found. v.*

*EPA*, 272 F. Supp. 2d 59, 66 (D.D.C. 2003) (finding search adequate where agency explained

"how the FOIA request was disseminated within [agency's] office and the scope of the search,

which particular files were searched, and the chronology of the search"); *Ferranti v. ATF*, 177 F.

Supp. 2d 41, 47 (D.D.C. 2001) ("Affidavits that include search methods, locations of specific

files searched, descriptions of searches of all files likely to contain responsive documents, and

names of agency personnel conducting the search  are considered presumptively sufficient."),

*summary affirmance granted*, No. 01-5451, 2002 WL 31189766, at *1 (D.C. Cir. Oct. 2, 2002).

## II.        THE WITHHOLDINGS BY DHS WERE PROPER.

DHS processed the responsive records in accordance with FOIA's requirements and

withheld certain information in full or in part pursuant to the exemptions established by 5 U.S.C.

§ 552(b)(3), (b)(4), (b)(5), and (b)(6).  As explained below, DHS properly invoked all

exemptions and released to EPIC all information reasonably segregable from the exempt records,

and is therefore entitled to summary judgment.

---

[4] As Ms. Medina explains in her declaration, one record, entitled "DHS S&T Countermeasures Test Beds (CMTB) Rail Security Pilot Final Report," was, upon further review, determined not be responsive to any of the categories of records sought by EPIC.  *Id.*, ¶ 15.  That record therefore is not at issue.

**A.      DHS Properly Withheld Competitive Proposal Information under Exemption 3**

DHS is withholding four records in full under FOIA Exemption 3, which permits an agency to withhold information that is:

> specifically exempted from disclosure by statute . . . if that statute

> (A) (i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or
> (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld.

5 U.S.C. § 552(b)(3); Medina Decl., ¶ 18; *Vaughn* Index, Record Nos. 1-4.  The Court's review of an agency's withholdings under Exemption 3 is extremely limited.  Specifically, "[w]hen analyzing whether the defendant is entitled to invoke Exemption 3, the court need not examine the detailed factual contents of specific documents withheld; rather, the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage."  *James Madison Project v. CIA*, 607 F. Supp. 2d 109, 126 (D.D.C. 2009) (internal quotation marks omitted).

The National Defense Authorization Act of 1997 specifically prohibits the disclosure of "a proposal in the possession or control of an agency" to any person under FOIA, so long as that proposal is not set forth or incorporated by reference in a contract entered into between the agency and the contractor that submitted the proposal.  41 U.S.C. §§ 253b(m)(1), (2).  A "proposal" is defined as "any proposal, including a technical, management or cost proposal, submitted by a contractor in response to the requirements of a solicitation for a competitive proposal."  *Id.*, § 253b(m)(3).

DHS has withheld the subject records on the grounds that they constitute competitive proposal information submitted in response to BAA 05-03.  Two of the records are proposal

submitted by by Rapiscan for work on Phases I and II of "Non-Intrusive Detection of Suicide

Bombers." *Vaughn* Index, Record Nos. 1-2. The other two records are proposals submitted by

NEU for "BomDetec – Wide Area Surveillance and Suicide Bomber Detection at > 10M." *Id*.,

Record Nos. 3-4. The contents of these proposals are not set forth or incorporated into the

contracts awarded to Rapiscan or NEU under BAA 05-03. Medina Decl., ¶ 18. They are

therefore properly withheld under Exemption 3. *Hornbostel*, 305 F. Supp. 2d at 30.

> **B.    DHS Properly Withheld Confidential Commercial and Financial Information under Exemption 4**

DHS is withholding nine records, five in full and four in part, under FOIA Exemption 4,

which exempts from disclosure "[1] trade secrets and commercial or financial information [2]

obtained from a person and [3] privileged or confidential." 5 U.S.C. § 552(b)(4) (bracketed

material added); Medina Decl., ¶¶ 19-21; *Vaughn* Index, Record Nos. 6-10, 12, 15-17; *see

generally* Rapiscan Decl. As explained below, the withheld records meet each of these criteria.

First, the information contained in the documents was obtained "from a person," which is

defined as "an individual, partnership, corporation, association, or public or private organization

other than an agency." 5 U.S.C. § 551(2). The withheld information was provided to DHS by

Rapiscan, a corporation, which qualifies as a "person" under FOIA. *Pub. Citizen Health Res.

Gp. v. NIH*, 209 F. Supp. 2d 37, 44 (D.D.C. 2002) ("There is no doubt that a corporation may be

considered a 'person' for purposes of exemption 4.").

Second, the information is "commercial or financial." The D.C. Circuit has broadly

interpreted these terms to mean that records are commercial so long as the submitter has a

"commercial interest" in them. *Pub. Citizen Health Res. Gp. v. FDA*, 704 F.2d 1280, 1290-91

(D.C. Cir. 1983). The information at issue pertains to technical and cost specifications of the

Whole Body Imaging system proposed by Rapiscan and contracted by DHS. Medina Decl., ¶

20; Declaration of Peter Modica (Modica Decl.), ¶¶ 1, 5-11.  For instance, Rapiscan has provided technical information on its Whole Body Imaging system, including internal procedures and software configurations for factory testing, system specifications and modifications unique to Rapiscan's system, design schematics and renderings, and cost estimates.  *See Vaughn* Index, Record Nos. 6-10.  This information falls squarely within the type of information which the courts have typically regarded as commercial.  *See, e.g., Allnet Communication Servs., Inc. v. FCC*, 800 F. Supp. 984, 986-88 (D.D.C. 1992); *Durnan v. Dep't of Commerce*, 777 F. Supp. 965, 965-67 (D.D.C. 1991).

Third, the information is confidential.  As the D.C. Circuit has articulated, whether commercial information should be considered confidential and therefore protected under Exemption 4 is guided by the substantial competitive harm test.  *National Parks and Conservation Ass'n v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974) ("*Nat'l Parks I*"), as modified by *National Parks and Conservation Ass'n v. Kleppe*, 547 F.2d 673, 679 (D.C. Cir. 1976) ("*Nat'l Parks II*").  This standard remains the definitive measure for evaluating whether information falls within the scope of Exemption 4 where the materials in question were not volunteered, but required to be provided, to the Government.  In *National Parks I*, the D.C. Circuit held that commercial or financial information qualified as "confidential" if disclosure of the information would likely: (1) "cause substantial harm to the competitive position of the person from whom [it] was obtained," or (2) "impair the Government's ability to obtain necessary information in the future."  498 F.2d at 770.  Disclosure here threatens both harms.

### 1.     Disclosure would cause substantial competitive harm to Rapiscan.

The D.C. Circuit does not require that a party show "actual competitive harm" in order to make an adequate showing of the likelihood of substantial competitive harm.  *Pub. Citizen*

*Health Res. Gp.*, 704 F.2d at 1291 (quoting *Gulf & W. Indus., Inc.*, 615 F.2d 527, 530 (D.C. Cir. 1979)). Rather, "evidence revealing '[a]ctual competition and the likelihood of substantial competitive injury' is sufficient to bring commercial information within the realm of confidentiality." *Kahn v. Fed. Motor Carrier Safety Admin.*, 648 F. Supp. 2d 31, 36 (D.D.C. 2009) (quoting *Pub. Citizen*, 704 F.2d at 1291). Although conclusory and generalized allegations of substantial competitive harm are insufficient to justify the application of Exemption 4, "the court need not engage in a sophisticated economic analysis to determine whether there is a likelihood of substantial competitive injury." *Id.*

Here, the declaration submitted by Rapiscan provides detailed support demonstrating that it faces actual competition in the emerging market for Advanced Imaging Technology, including Whole Body Imaging systems and the likelihood of substantial competitive injury that would result from disclosure of their commercial and financial information. *See Nat'l Parks II*, 547 F.2d at 684 (concluding that it is "virtually axiomatic" that disclosure of commercial and financial information is likely to cause competitive harm in light of the "extremely detailed and comprehensive nature of the financial records requested").

As Peter Modica, Vice President of Product Line Management for Rapiscan attests, the Advanced Imaging Technology market is highly competitive throughout the world. Modica Decl., ¶ 12. Domestically, there is "considerable" competition for the provision of scanner systems to the United States, where it is expected that the Transportation Security Administration will procure 500 Advanced Imaging Technology systems in the near term. *Id.*, ¶ 13. In such a competitive environment, firms seek any increment of useful information about their competitors' businesses, particularly their pricing and technical capability, because obtaining that information could give them a decisive advantage. *Id.*

14

The Rapiscan records withheld under Exemption 4 fall into four categories: indirect cost information, unit pricing information, systems design and specifications information, and employee contact information. *See* Modica Decl., ¶¶ 11-15. The indirect cost information includes labor rates, indirect costs and costs for supplies and services. *Id.*, ¶ 5; *Vaughn* Index, Record Nos. 8-9, 15. Rapiscan does not release this information publically, maintaining it on a secure, password-protected intranet system; and limiting access to authorized persons. Disclosure of this information would provide competitors with insight into Rapiscan's cost structure, enabling them to predict Rapiscan's ability to price contracts in future procurements. Modica Decl., ¶ 6; *see Hecht v. Agency for Int'l Dev.*, No. 95-263, 1996 WL 33502232, at *8-*9 (D. Del. Dec. 18, 1996) (upholding application of Exemption 4 to indirect cost rates); 48 C.F.R. § 15.506(e) (prohibiting disclosure of indirect cost rates and other confidential commercial information during offeror debriefing).

Rapiscan's unit pricing information, if disclosed, would provide competitors with a roadmap to how Rapiscan prices its scanner systems and related research and development projects. Modica Decl., ¶ 7; *see Vaughn* Index, Record Nos. 8, 15, 16. Furthermore, this information, when combined with other pricing information, would provide competitors insight into how Rapiscan and its suppliers and subcontractors adjust their prices over time, thereby allowing competitors to forecast Rapiscan's prices. Modica Decl., ¶ 7. Competitors would therefore be able to undercut Rapiscan's prices in future competitions. *Id.*; *see Essex Electro Engineers, Inc. v. Sec'y of Army*, 686 F. Supp. 2d 91, 94 (D.D.C. 2010) (upholding application of Exemption 4 to unit pricing data).

The design and specifications for Rapiscan's Whole Body Imager include image resolution measurements, detection capabilities, effectiveness of the system at particular

distances, and the ability of scanner to operate in multiple configurations.  Modica Decl., ¶ 8; *Vaughn* Index, Record Nos. 6-10, 12.  Rapiscan believes that the design for its imaging system (known as the Secure 1000) gives it a decisive advantage over its competitors.  The disclosure of this information would allow competitors to more effectively design and build their own systems to compete with Rapsican for future contracts.  Modica Decl., ¶ 9; *see SMS Prods. Gp., Inc. v. Dep't of Air Force*, No. 88-481, 1998 WL 201031, at *3 (D.D.C. May 11, 1989) (upholding application of Exemption 4 to proprietary technical information concerning competitor's laptop computer, noting that competition in laptop market is "fierce").

Finally, release of employees' contact information also would harm Rapiscan.  It has invested heavily in the training of its employees in order to develop a workforce capable of competing in a rapidly emerging technological market.  Equipping competitors with contact information would make it easier for them to recruit away employees with knowledge of the development and capabilities of Rapiscan's scanner systems.  Modica Decl., ¶¶ 10-11; *Vaughn* Index, Record Nos. 15-17; *Met. Life Ins. Co. v. Usery*, 426 F. Supp. 150, 160-63 (D.D.C. 1977).[5]

In sum, disclosure of Rapiscan's confidential commercial information, as described above, would likely injure Rapiscan's competitive position in the scanner technology market. Therefore, DHS properly withheld the subject records under Exemption 4.

### 2.     Disclosure would impair DHS's research and development efforts.

In evaluating the interests protected by Exemption 4, courts have recognized interests beyond the impairment of an agency's ability to obtain necessary information in the future, such as the interest in the effectiveness of a government program.  *See Pub. Citizen Health Res. Gp.*, 209 F. Supp. 2d at 51-52 (observing that "impairment of the effectiveness of a government

---

[5] DHS has also invoked Exemption 6 with respect to the contact information of these employees and other private individuals.  *See* Argument, § II.D.

program is a proper factor for consideration in conducting an analysis under FOIA exemption

4"); *Comstock Int'l (U.S.A.), Inc. v. Ex.-Im. Bank of the United States*, 464 F. Supp. 804, 808

(D.D.C. 1979) (citing *Nat'l Parks I*, 498 F.2d at 770 n.17) (upholding agency's application of

Exemption 4 to withhold information obtained through negotiation because effectiveness of

government program would be impaired by disclosure).

      In addition to the competitive harm that may result to DHS's contracting parties,

disclosure of the requested information would have an adverse impact on DHS's ability to

sponsor research and development in emerging security technologies. For instance, the PTIEDD

program was created to solicit research and prototype development of devices capable of

detecting explosives hidden in vehicles, leave-behind packages, and carried by suicide bombers –

among the most challenging of homeland security issues. BAA 05-03 (Ex. 1); Medina Decl., ¶

2. DHS sought to spur this research because at the time no deployable or operational system

existed in the mass transit context. Medina Decl., ¶ 6. Indeed, no such system exists even today.

*Id*.

      Companies such as Rapiscan are engaged in keen competition in this arena and have a

legitimate expectation that their confidential financial and technical information will not be

disclosed to the public and thus available to their competitors. *Id.*, ¶ 21; Modica Decl., ¶ 4. To

that end, BAA 05-03 expressly stated that all submissions were to be submitted to a password-

protected website requiring registration by the submitter, would be reviewed only by the

submitter, authorized government representatives, support contractors and assigned evaluators

who had signed appropriate non-disclosure agreements; and would be considered

"proprietary/source selection sensitive." BAA 05-03 (Ex. 1) at 8-9; Medina Decl., ¶ 4; Modica

Decl., ¶ 4 (explaining that Rapiscan secured non-disclosure agreements from DHS technical

advisors).  Release of a submitter's financial and technical information directly undercuts that

expectation.  If DHS was required to do so with respect to Rapiscan, it would discourage

Rapiscan and other companies from participating in DHS-sponsored research like the PTIEDD

program.  Modica Decl., ¶ 14.  Because this reluctance would impair DHS's ability to incubate

emerging technologies capable of protecting the homeland at a time when the threat of a

domestic terrorist attack remains of utmost concern, DHS properly applied Exemption 4 to

withhold Rapiscan's commercial information shared in conjunction with its contract.  Medina

Decl., ¶ 21; see *Judicial Watch*, 108 F. Supp. 2d at 30 (upholding application of Exemption 4 to

export insurance documents where disclosure would interfere with agency's "ability to carry out

its statutory purpose" of promoting the exchange of goods between the United States and foreign

countries).

### C.  DHS Properly Withheld Deliberative Process-Privileged Information under Exemption 5

DHS is withholding three records, two in full and one in part, under FOIA Exemption 5,

which protects "[1] inter-agency or intra-agency memorandums or letters [2] which would not be

available by law to a party other than an agency in litigation with the agency."  5 U.S.C. §

552(b)(5) (bracketed material added); Medina Decl., ¶ 22; *Vaughn* Index, Record Nos. 5, 8, 17.

Courts have construed this language to exempt those documents that are normally protected in

the civil discovery context and to incorporate all evidentiary privileges that would be available in

that context.  *See United States v. Weber Aircraft Corp.*, 465 U.S. 792, 799 (1984); *FTC v.

Grolier, Inc.*, 462 U.S. 19, 26 (1983); *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975);

*Martin v. Office of Special Counsel*, 819 F.2d 1181 (D.C. Cir. 1987).  As explained below, the

withheld documents meet each of the Exemption 5 criteria.

First, the records are "intra-agency" communications.  Courts have expansively interpreted this term to include not only records generated within agencies, but also advice generated by outside experts working for or on behalf of agencies.  *See*, *e.g.*, *Soucie v. David*, 448 F.2d 1067, 1078 n.44 (D.C. Cir. 1971).  This is because federal agencies frequently have a special need for opinions and recommendations "outside their ken, and it clearly is preferable that they enlist the help of outside experts skilled at unraveling their knotty complexities.  *CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1162 (D.C. Cir. 1987); *Ryan v. Dep't of Justice*, 617 F.2d 781, 790 (D.C. Cir. 1980) ("Congress apparently did not intend 'inter-agency or intra-agency' to be rigidly exclusive terms.").[6]

Here, the withheld documents were generated by or as a result of Rapiscan and NEU's meetings and consultations with DHS officials under the contract to develop a suicide bomber detection systems.  *Vaughn* Index, Record Nos. 5, 8, 17.  The documents assess the progress of the detection system, including strengths and weaknesses, and identify and evaluate factors for the parties to consider in moving into the next phase of work.  *Id.*  Rendering this candid, neutral advice under a government contract is analogous to the type of work an employee of DHS would do directly, and falls within the scope of intra-agency communications required by Exemption 5. *See*, *e.g.*, *Info. Network for Responsible Mining v. Dep't of Energy*, No. 06-2271, 2008 WL 762248, at *7 (D. Colo. Mar. 18, 2008) (ruling that advisory documents from contractor to agency concerning agency program qualified as intra-agency); *CREW v. DHS*, 514 F. Supp. 2d at 44 (protecting documents prepared by contractors for FEMA); *Sakamoto v. EPA*, 443 F. Supp.

---

[6] Courts have likewise broadly construed the term "memorandums and letters" to include emails, meeting minutes, and briefing materials – the types of documents at issue under DHS's Exemption 5 claim.  *See*, *e.g.*, *Hornbostel*, 305 F. Supp. 2d at 31 (protecting emails); *Carter, Fullerton & Hayes LLC v. FTC*, 520 F. Supp. 2d 134, 144 (D.D.C. 2007) (protecting meeting notes); *CREW v. Dep't of Homeland Security*, 514 F. Supp. 2d 36, 44 (D.D.C. 2007) (protecting briefing materials).

2d 1182, 1191 (N.D. Cal. 2006) (protecting documents prepared by a private contractor hired to perform audit for agency); *Citizens Progressive Alliance v. Bureau of Indian Affairs*, 241 F. Supp. 2d 1342, 1355 (D.N.M. 2001) (protecting recommendations provided by private company hired by BIA).

Second, the documents would not be available to an adverse party in litigation with the agency. The documents at issue are protected by the deliberative process privilege, the purpose of which is to prevent injury to the "quality of agency decisions." *Klamath Water Users Protective Ass'n v. Dep't of Interior*, 532 U.S. 1, 8 (2001). The privilege is an ancient one predicated on the recognition that "the quality of administrative decision-making would be seriously undermined if agencies were forced to operate in a fishbowl." *Dow Jones & Co. v. Dep't of Justice*, 917 F.2d 571, 573 (D.C. Cir. 1990) (quoting *Wolfe v. HHS*, 839 F.2d 768, 773 (D.C. Cir. 1988) (en banc)). It is intended to: (1) encourage open, frank discussion of policy matters between subordinates and supervisors; (2) protect against premature disclosure of proposed policies before they become final; and (3) protect against public confusion that might result from the disclosure of reasons and rationales that were not, in fact, the ultimate grounds for the agency's action. *See Russell v. Dep't of Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982); *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980); *Jordan v. Dep't of Justice*, 591 F.2d 753, 772-73 (D.C. Cir. 1978) (en banc), *overruled in part on other grounds*, *Crooker v. ATF*, 670 F.2d 1051 (D.C. Cir. 1981) (en banc). Accordingly, the privilege protects not merely documents, but also the integrity of the deliberative process itself where the exposure of that process would result in harm. *Nat'l Wildlife Fed'n v. U.S. Forest Serv.*, 861 F.2d 1114, 1119 (9th Cir. 1988).

To assert the privilege, the information must be both pre-decisional and deliberative.  *See Mapother v. Dep't of Justice*, 3 F.3d 1533, 1537 (1993).  A document is pre-decisional if "it was generated before the adoption of an agency policy," and deliberative if "it reflects the give-and-take of the consultative process.  *Coastal States*, 617 F.2d at 866.  The withheld documents are both.

The first document is an email (including attachments) from a NEU official to one of the DHS program managers for the BomDetec development program.  The email outlines the author's evolving thinking on development and technology and system testing choices to be considered in Phase II.  *Vaughn* Index, Record No. 5.  The second record is a set of minutes from a "preliminary design review" meeting between Rapiscan and DHS.  The minutes record internal discussions of options presented to DHS for moving forward with Phase II of system design, a variety of possible deployment scenarios, and the type of software that may need to be developed to effectively manage the system.  *Id.*, Record No. 8.  The third record is a set of briefing materials concerning development of Rapiscan's system.  The record provides a discourse on the strengths and weaknesses of Rapiscan's prototype system and, like the other two records, sets forth items for DHS to consider before moving forward with further development.  *Id.*, Record No. 17 [7]

In sum, all three records reflect officials offering candid assessment of the progress in developing the respective suicide bomber detection systems, and factors to be considered in refining and improving the systems in future phases of development.  In other words, they are the "give-and-take," *Coastal States*, 617 F.2d at 866, that is critical to the internal government

---

[7] The fact that the contracts awarded to NEU and Rapiscan have expired does not alter the pre-decisional character of the records withheld under Exemption 5.  *EPIC v. DHS*, 384 F. Supp. 2d at 112 (holding that records concerning now-abandoned agency program were nonetheless predecisional).

decision-making process, particular where, as here, emerging technologies are involved.  *See Chem. Mfrs. Ass'n v. Consumer Prod. Safety Comm'n*, 600 F. Supp. 114, 118 (D.D.C. 1984) (holding it appropriate to withhold technical materials when disclosures of a scientist's "nascent thoughts . . .would discourage the intellectual risk-taking so essential to technical progress").  Release of these records, by their very nature, would stifle the free and frank exchange of information within DHS.  *Nat'l Wildlife Fed'n*, 861 F.2d at 1121 ("Recommendations on how to best deal with a particular issue are themselves the *essence* of the deliberative process."); *see CREW v. DHS*, 514 F. Supp. at 44 (protecting briefing materials concerning ongoing response to Hurricane Katrina, which included "proposed solutions and approaches").  They are therefore properly withheld under Exemption 5.

**D.      DHS Properly Withheld Information under Exemption 6 That if Released Would Constitute an Unwarranted Invasion of Personal Privacy**

DHS is withholding from eight records telephone numbers, email addresses and signatures of employees of Rapiscan, NEU and DHS under Exemption 6, which protects information about individuals in "personnel and medical and similar files" when "disclosure would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6); Medina Decl., ¶ 23; *Vaughn* Index, Record Nos. 5, 8, 11, 13-17.  To evaluate an Exemption 6 claim, a court should ask three questions:  whether the withheld information is contained in a personnel, medical or "similar" file; whether disclosure would compromise a "substantial privacy interest;" and, if so, whether the public interest in disclosure outweighs the privacy interest in non-disclosure.  *Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 602 (1982); *Consumers' Checkbook Ctr. for the Study of Servs. v. HHS*, 554 F.3d 1046, 1050 (D.C. Cir. 2009).

The information withheld by DHS – contained in emails, contracts and miscellaneous documents – falls within Exemption 6.  Although the information does not come from personnel or medical files, "the Supreme Court has made clear that the phrase 'similar files' is intended to cover personal information contained in any government records regardless of how they are labeled."  *Phillips v. Immigration Customs & Enforcement*, 385 F. Supp. 2d 296, 304 (D.D.C. 2005) (involving personal information contained in agency counsel memoranda) (citing *Wash. Post*, 456 U.S. at 602).

The privacy interest at stake is substantial.  In the FOIA context, a "substantial privacy interest is anything greater than a de minimis privacy interest."  *Multi Ag Media LLC v. USDA*, 515 F.3d 1224, 1229 (D.C. Cir. 2008).  As explained by Ms. Medina, signatures were withheld not only as personalized information but also to guard against identity theft and impersonation. Medina Decl., ¶ 23; *see Wilson v. U.S. Air Force*, No. 08-324, 2009 WL 4782120, at *3 (E.D. Ky. Dec. 9, 2009) (applying Exemption 6 to signatures).  Telephone numbers and email addresses were withheld to protect the individuals, all of whom were involved in mass transit security matters, from the risk of harassing or threatening emails and calls in the work place. Medina Decl., ¶ 23.  Work contact information has been held to be protected for both private and government employees.  *Electronic Frontier Found. v. Office of Dir. of Nat'l Intelligence*, 639 F.3d 876, 888 (9th Cir. 2010) (applying Exemption 6 to third party email addresses because one "can easily envision possible privacy invasions resulting from public disclosure"); *Budik v. Dep't of Army*, 742 F. Supp. 2d 20, 38 (D.D.C. 2010) (applying Exemption 6 to government employee's email address); *Phillips*, 385 F. Supp. 2d at 308 (same with respect to government employee email addresses and telephone numbers); *Wilson*, 2009 WL 4782120, at *3 (same with respect to government employee email addresses); *but see Leadership Conf. on Civil Rights v.*

*Gonzales*, 404 F. Supp. 2d 246, 257 (D.D.C. 2005) (finding that government employee work telephone numbers are not information similar to a personnel or medical file).[8]

And that privacy interest outweighs any public interest in disclosure.  DHS has released the names of the individuals, thereby enabling EPIC to identify those DHS officials and third party employees who were involved in the Rapiscan and NEU explosives detection programs contracted by DHS.  The release of these names satisfies the only cognizable public interest in any FOIA action:  to "shed . . . light on an agency's performance of its statutory duties."  *Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U .S. 749, 773 (1989).  The signatures, telephone numbers and email addresses add nothing to that interest.  *Electronic Frontier Found.*, 639 F.3d at 888; *Budik*, 742 F. Supp. 2d at 38.

## III.   DHS Has Released All Reasonably Segregable Information to EPIC

FOIA requires that if a record contains information that is exempt from disclosure, any "reasonably segregable" information must be disclosed after deletion of the exempt information unless the non-exempt portions are "inextricably intertwined with exempt portions."  5 U.S.C. § 552(b); *Mead Data Central, Inc. v. Dep't of Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977); *Hornbostel*, 305 F. Supp. 2d at 34.  The D.C. Circuit has held that a district court considering a FOIA action has "an affirmative duty to consider the segregability issue sua sponte."  *Trans-Pacific Policing Agreement v. United States Customs Serv.*, 177 F.3d 1022, 1028 (D.C. Cir. 1999).

In order to demonstrate that all reasonably segregable material has been released, the agency must provide a "detailed justification" rather than "conclusory statements."  *Mead Data*,

---

[8] *Leadership Conference* is distinguishable on the grounds that the agency also withheld the names of government employees, so as to preclude any means of identifying certain employees involved in a voter integrity initiative spearheaded by the Attorney General.  404 F. Supp. 2d at 256-57.  Here, as explained below, DHS has released the names of the individuals.  Only their contact information and signatures have been withheld.

566 F.2d at 261.  The agency is not, however, required "to provide such a detailed justification" that the exempt material would effectively be disclosed.  *Id.*  All that is required is that the government show "with 'reasonable specificity'" why a document cannot be further segregated. *Armstrong v. Executive Office of the President*, 97 F.3d 575, 578-79 (D.C. Cir. 1996). Moreover, the agency is not required to "commit significant time and resources to the separation of disjointed words, phrases, or even sentences which taken separately or together have minimal or no information content."  *Mead Data*, 566 F.2d at 261, n.55.

DHS has processed and released all reasonably segregable information from the responsive records under Exemptions 4, 5 and 6.  For instance, it has narrowly applied Exemption 6 to withhold only personal information as explained above, and released all non-exempt information from those records.  *Vaughn* Index, Record Nos. 11, 13-17.  It has done the same with records that contain information subject to Exemptions 4 and 5.  *Id.*, Record Nos. 12, 15-17.  And it has conducted multiple reviews to ensure segregability, releasing additional information and records.  Medina Decl., ¶ 25.

## **CONCLUSION**

For the reasons set forth above, Defendant respectfully requests that this Court grant its motion for summary judgment.

Respectfully submitted,

RONALD C. MACHEN JR., D.C. Bar #447889
United States Attorney

RUDOLPH CONTRERAS, D.C. Bar #434122
Chief, Civil Division

By:  ____/s/_____
JAVIER M. GUZMAN, D.C. Bar #462679
Assistant United States Attorney
555 4th Street, N.W.

25

Washington, D.C. 20530
Tel: (202) 616-1761
Fax: (202) 514-8780
Javier.Guzman2@usdoj.gov

*Of counsel:*
Marshall L. Caggiano, Esq.
Office of General Counsel
Science and Technology Directorate
Department of Homeland Security