**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER ) ) ) ) Plaintiff, ) v. ) ) UNITED STATES DEPARTMENT OF ) HOMELAND SECURITY ) ) Defendant. ) ) | No. 1:11-00945 (ABJ) |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Plaintiff the Electronic Privacy Information Center ("EPIC") opposes Defendant U.S. Department of Homeland Security's ("DHS") August 22, 2011 Motion for Summary Judgment, and cross-moves for summary judgment in favor of EPIC.

Specifically, EPIC (1) challenges the DHS's withholding of Vaughn Index Documents 5, 8, and 17 and (2) seeks an order compelling the DHS to pay EPIC's fees and costs for this lawsuit, because EPIC qualifies for such relief irrespective of the outcome of the parties' cross-motions for judgment.

**FACTUAL BACKGROUND**

In 2005, the Transportation Security Administration ("TSA"), a DHS component, began testing Whole Body Imaging ("WBI") technology solely in U.S. airports to examine air travelers on commercial aircraft. WBI devices, which use either backscatter x-ray and millimeter wave technology, capture detailed, three-dimensional images of individuals. The WBI devices literally

peer through clothing to observe and capture an image of the naked human body.

In March 2010, the DHS released a "Surface Transit Security Priority Assessment," which detailed the agency's plans to expand significantly the WBI program and deploy new body scanner technology in America's surface transportation systems, including "mass transit, highways, freight rail, and pipelines…"  Body scanner devices had previously been tested at surface transportation stations in both the U.S. and abroad. In 2006, millimeter wave machines were tested on PATH train riders at a New Jersey train station. The DHS has acknowledged that both passive and active millimeter wave technology were employed in this setting. In the summer of 2009, the PATH train system, in conjunction with the Department of Homeland Security, once again tested body scanner technology on PATH travelers.

The DHS has also considered the deployment of mobile WBI technology, referred to as "Z Backscatter Vans." These vans are equipped with concealed WBI devices and are able to scan other vehicles while driving down public roadways and are capable of seeing through vehicles and clothing.

On November 24, 2010, EPIC transmitted, via certified mail, a written FOIA request to the DHS for agency records ("EPIC's FOIA Request"). EPIC requested the following agency records:

> all documents detailing plans by federal law enforcement agencies to implement body scanner technology in the surface transit context;
>
> all contracts, proposals, and communications with private transportation and shipping companies (including, but not limited to NJ PATH, Amtrak, and Greyhound) regarding the implementation of body scanner technology in surface transit;
>
> all contracts, proposals, and communications with states, localities, tribes, and territories (and their subsidiaries or agencies) regarding the implementation of body scanners in surface transportation;
>
> all documents detailing plans by federal law enforcement agencies to use "Z Backscatter Vans" or similar technology;

all contracts, proposals, and communications with the manufacturers of the "Z Backscatter Vans" or similar technology;

all contracts, proposals, and communications with states, localities, tribes, and territories (and their subsidiaries or agencies) regarding the implementation of "Z Backscatter Vans" or similar technology;

all images generated by the "Z Backscatter Vans" or body scanner technology that has been used in surface transit systems.

The DHS failed to make a timely determination concerning EPIC's FOIA Request, and failed to disclose any records within the FOIA's deadline. The agency did not substantively respond to EPIC until February 16, 2011, two and a half months after EPIC sent its request.

On February 16, 2011, the Science and Technology ("S&T") component of the DHS stated that it had located 1,156 pages of records responsive to EPIC's FOIA request. Of these records, the agency released 15 pages in their entirety, 158 pages in redacted form, and withheld 983 pages in their entirety. On April 14, 2011, EPIC filed an administrative appeal ("EPIC's Appeal") challenging the S&T's withholding of documents. EPIC's Appeal challenged the S&T's partial withholding of 158 pages of documents and the S&T's complete withholding of 983 pages of documents.

The agency failed to comply with the statutory deadline to reply to EPIC's Appeal and EPIC filed suit on May 20, 2011, initiating this lawsuit. On August 15, 2011, following the filing of this suit, the agency disclosed an additional 151 pages in their entirety and 21 pages in redacted form.

As set forth below, EPIC challenges the propriety of the agency's withholdings.

## STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine issue as to the material facts, and the moving party demonstrates it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). FOIA lawsuits are typically resolved on cross-motions for summary judgment. *Reliant Energy Power Generation v. FERC*, 520 F. Supp. 2d 194, 200 (D.D.C. 2007). A court reviews agency handling of a FOIA request *de novo*. 5 U.S.C. § 552(a)(4)(B).

The U.S. Supreme Court "repeatedly has stressed the fundamental principle of public access to Government documents that animates the FOIA." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 151-52 (1989). "In enacting FOIA, Congress struck the balance it thought right-- generally favoring disclosure, subject only to a handful of specified exemptions--and did so across the length and breadth of the Federal Government." *Milner v. Dep't of the Navy*, 131 S. Ct. 1259, 1266 (2011). As the Court has previously explained, "[t]he basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). The FOIA's "basic purpose reflect[s] a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language." *Dept. of the Air Force v. Rose*, 425 U.S. 352, 360-61 (1976), quoting S. Rep. No. 813, 89th Cong., 1st Sess., 3 (1965). FOIA was meant to be a "disclosure statute," not a "withholding statute." *Milner*, 131 S. Ct. at 1262.

The FOIA includes exemptions from disclosure, "[b]ut these limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act." *Rose*, 425 U.S. at 361. Therefore FOIA exemptions "must be narrowly construed." *Id*. "The statute's

goal is broad disclosure, and the exemptions must be given a narrow compass." *Milner*, 131 S.

Ct. at 1261 (internal citations omitted). Furthermore, "the burden is on the agency to sustain its

action." 5 U.S.C. § 552(a)(4)(B); *see also EPIC v. Dept. of Homeland Security*, 384 F. Supp. 2d

100, 106 (D.D.C. 2005).

## ARGUMENT

### I.  FOIA Exemption 5 Does Not Permit the Agency to Withhold Emails, Meeting Minutes, and Briefing Materials

Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or

letters which would not be available by law to a party other than an agency in litigation with the

agency. 5 U.S.C. § 552(b)(5). The exemption is to be applied "as narrowly as consistent with

efficient Government operation." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854,

868 (D.C. Cir. 1980) *citing* S. Rep. No. 89-813 (1965).

To qualify, a document must satisfy two conditions: "its source must be a Government

agency, and it must fall within the ambit of a privilege against discovery under judicial standards

that would govern litigation against the agency that holds it." *Dep't of Interior v. Klamath Water

Users Protective Ass'n*, 532 U.S. 1, 8 (2001). In order to justify withholding under this

exemption, the agency must demonstrate that it meets both requirements; as the United States

Supreme Court has pointed out "the first condition of Exemption 5 is no less important than the

second; the communication must be 'inter-agency or intra-agency.'" *Id.*

### a.  *The Documents Are Not "Inter-agency or Intra-agency Memorandums or Letters," and, Thus, Are Not Exempt Under Exemption 5*

As the DHS notes, the Supreme Court has recognized that memorandums prepared by

outside experts and consultants can be considered "inter-agency or intra-agency" for the

purposes of Exemption 5:

> It is textually possible and . . . in accord with the purpose of the provision, to regard as an intra-agency memorandum one that has been received by an agency, to assist it in the performance of its own functions, from a person acting in a governmentally conferred capacity other than on behalf of another agency-*e.g.,* in a capacity as employee or consultant to the agency, or as employee or officer of another governmental unit (not an agency) that is authorized or required to provide advice to the agency.

*U.S. Dept. of Justice v. Julian*, 486 U.S. 1, 18 n.1 (1988). However the Court has explained that, in order for materials created or provided by consultants to be exempt under Exemption 5, the consultant must "not represent an interest of its own, or the interest of any other client, when it advises the agency that hires it." *Klamath Water Users*, 532 U.S. at 11. The consultant's "only obligations are to truth and its sense of what good judgment calls for, and in those respects the consultant functions just as an employee would be expected to do." *Id.* Furthermore, when an outside group communicates its views to an agency that are "necessarily adverse to the interests of competitors," the outside group does not act in a consulting capacity. *Citizens for Responsibility & Ethics in Washington v. U.S. Dept. of Homeland Sec.*, 514 F. Supp. 2d 36, 44 (D.D.C. 2007), *citing Klamath Water Users,* 532 U.S. at 15.

In *Klamath Water Users*, the Supreme Court ruled that Native American tribes' communications with the Department of the Interior regarding water rights were not exempt under Exemption 5. The Court held that the tribes were not "consultants" for the purposes of this exemption, because they were communicating with the Bureau "with their own, albeit entirely legitimate, interests in mind," they were "self-advocates at the expense of others seeking benefits inadequate to satisfy everyone." *Klamath Water Users,* 532 U.S. at 12.

The DHS cites several cases to support its proposition that Rapiscan and Northeastern University ought to be considered "consultants" for the purposes of Exemption 5. However, none of the entities in those cases share Rapiscan and Northeastern's self-interest; they acted in "a governmentally conferred capacity." In every case cited by the defendant, the entities in

question were hired to evaluate or perform neutral audits of an already existing agency program.

*See Info. Network For Responsible Mining (Inform) v. Dep't of Energy*, CIV. 06-CV-02271-REB, 2008 WL 762248 (D. Colo. Mar. 18, 2008), *Citizens for Responsibility & Ethics in Washington*, 514 F. Supp. 2d 36 (D.D.C. 2007), *Sakamoto v. U.S. Envtl. Prot. Agency*, 443 F. Supp. 2d 1182 (N.D. Cal. 2006), *Citizens Progressive Alliance v. U.S. Bureau of Indian Affairs*, 241 F. Supp. 2d 1342, 1355 (D.N.M. 2002).

In fact, the present case is much more like *Physicians Committee for Responsible Medicine v. National Institutes of Health*, 326 F. Supp. 2d 19, 28 (D.D.C. 2004), in which the D.C. District court ruled that information from a grant applicant, Dr. Podrell, was not exempt under Exemption 5. The court found that the grant applicant's assertion that the application contained patentable, proprietary, and commercial information weighed heavily against his argument that it was an "inter-agency or intra-agency" document. Specifically, the court held that:

> Thus, Dr. Podell's hope of marketing the results of his research cannot be considered an integral part of the agency's deliberative process, but instead must be viewed as an effort taken for his own self-interest. This fact alone distinguishes Dr. Podell's initial grant application from that of a consultant. The distinction is even more evident in that Dr. Podell was in competition with other grant applicants and had a self-interest in being awarded the grant. Thus, even if communications come from paid consultants, which can qualify the communications as intra-agency in nature, they are not entitled to Exemption 5 protection when they come 'from an interested party seeking a Government benefit at the expense of other applicants.'" (internal citations omitted.)

*Physicians Comm. for Responsible Med.*, 326 F. Supp. 2d at 29-30.

Neither Rapiscan nor Northeastern meet the Supreme Court's requirement that a consultant must "not represent an interest of its own, or the interest of any other client, when it advises the agency that hires it." *Julian*, 486 U.S. at 18 n.1.

Northeastern University was engaged in selling its BomDetec program to the Department of Homeland Security. Northeastern has numerous publicly available promotional items

available for the BomDetec program. *See e.g.* Pl. Exhib. 1, 2. These items clearly demonstrate that Northeastern is actively marketing a product. In this case, the synthesis of "four technologies – intelligent video, radar, X-ray, and terahertz – into one surveillance system." Pl. Exhib. 1. The promotional brochure describes the BomDetec product, as well as Northeastern University industry partners (which include Siemens and Raytheon) who are actively working with Northeastern to develop this product.

Rapiscan was also aggressively competing to market body scanners to the Department of Homeland Security. As described in the Defendant's Summary Judgment motion, Rapiscan was awarded a contract to adapt its body scanner devices to standoff detection in mass transit systems. Def.'s Motion for Summ. Judg. at 2-3. Rapiscan and the Defendant have gone to great lengths to describe the adversarial and competitive nature of the body scanner procurement process. *See* Def.'s Motion for Summ. Judg. at 13-16, Modica Dec. ¶ 13. Defendant states "Domestically, there is 'considerable' competition for the provision of scanner systems to the United States, where it is expected that the Transportation Security Administration will procure 500 Advanced Imaging Technology systems in the near term." Modica Dec. ¶ 13. Indeed, even the title of the Rapiscan employee providing the declaration, "Vice President of Product Line Management," Modica Dec. ¶ 1, suggests that this was an exchange between the agency and a "self-advocate[]" who was marketing a product to the agency "at the expense of others seeking benefits inadequate to satisfy everyone." *Klamath Water Users,* 532 U.S. at 12.

At the time that these emails, meeting minutes, and briefing materials were created, both Rapiscan and Northeastern were still engaged in the highly competitive, highly lucrative process of selling a product to the agency. Though they had been granted contracts for development, the biggest prize: the contract for an actual rollout of this technology in rail stations across the

country, had not yet been won. Rapiscan and Northeastern University were communicating with the agency not as independent agents to advance the Department of Homeland Security's interests, but as self-interested actors intent on selling their product to the agency. They were still engaged in an ongoing, intense, high-stakes competition to win large, long-term government contracts. They were communicating with the agency in the same way that the tribes in *Klamath* were: "with their own, albeit entirely legitimate, interests in mind," they were "self-advocates at the expense of others seeking benefits inadequate to satisfy everyone." *Klamath Water Users,* 532 U.S. at 12. Like Dr. Podrell, the grant applicant in *Physicians Committee for Responsible Medicine*, Rapiscan and Northeastern were engaged in a competition with other parties and had self-interest in being awarded further government funds. Hence, the withholding of these three documents under Exemption b(5) was improper, because they are not "inter-agency or intra-agency memorandums or letters." *Id*.

> B.      *The Documents Do Not Qualify for the Deliberative Process Privilege, Because They Contain Factual Information, Not Opinions, Recommendations, or Deliberations*

Even if the Court finds that the agency has satisfied the first prong of the Exemption 5 test, the agency has still failed to satisfy the second prong: "it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it." *Klamath Water Users*, 532 U.S. at 8. The agency has withheld emails, meeting minutes, and briefing materials (Vaughn Index Documents #5, 8, and 17), wrongly claiming that they are protected under the deliberative process privilege.

Encompassed in Exemption 5 is the "deliberative process" privilege, which protects from disclosure "documents reflecting advisory opinions, recommendations, and deliberations that are part of a process by which governmental decisions and policies are formulated." *Klamath Water Users,* 532 U.S. at 8.

9

However, the DHS misstates the definition of "deliberative process" and overstates its scope. In the Vaughn Index, the DHS claims that items #5, 8, and 17 were withheld under the deliberative process privilege because "The release of this internal information would discourage the expression of candid opinions *and inhibit the free and frank exchange of information among agency personnel*." Vaughn Index Items #5, 8, 17 (emphasis added). Setting aside the dispute about whether or not this is actually an exchange of information "among agency personnel," the DHS characterization of Exemption 5 has created a second category of agency records that cannot be properly withheld as deliberative. The purpose of the privilege is to protect "frank discussions of legal or policy matters." *Environmental Protection Agency v. Mink*, 410 U.S. 73, 87, (1972) (finding that the justification for the deliberative process privilege is that "[I]t would be impossible to have any frank discussions of legal or policy matters in writing if all such writings were to be subjected to public scrutiny"); *Dow Jones & Co., Inc. v. Dept. of Justice*, 917 F.2d 571 (D.C. Cir. 1990)(confirming that "[w]e have said that the purpose of Exemption 5 is to encourage the frank discussion of legal and policy issues")(internal citations omitted); *Judicial Watch, Inc. v. U.S. Dept. of Treasury*, 2011 WL 3582152 (D.D.C. Aug. 16, 2011)(finding that the purpose of Exemption 5 is to protect "frank exchange of ideas on legal or policy matters"); S. Rep. No. 89-813 (1965); *see also* H.R. Rep. No. 89-1497 (1966)( stating that "a full and frank exchange of *opinions* would be impossible if all internal communications were made public")(emphasis added). The privilege doesn't exist to protect "the free and frank exchange of *information*," it exists to protect "frank discussions of *legal or policy matters*." *Id.*

Defendant's expansion of this doctrine would include not only discussions of policy, "advisory opinions, recommendations, and deliberations," *Klamath Water Users,* 532 U.S. at 8, but would sweep in all information, even purely factual information, contrary to case law and the

stated purpose of the Exemption. *See Petroleum Info. Corp.*, 976 F.2d at 1434 (D.C. Cir. 1992); S.REP.NO. 89-813 (1965). This is, quite simply, not the purpose or scope of this privilege, as set out by the Supreme Court. *See Klamath Water Users,* 532 U.S. at 8. Neither of the cases cited by the Defendant to support the proposition that the deliberative process privilege protects the "free and frank exchange of *information*" actually support this expansive scope.

Under the deliberative process privilege, factual information generally must be disclosed, but materials embodying officials' opinions are ordinarily exempt. *Petroleum Info. Corp. v. U.S. Dept. of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992), *citing EPA v. Mink,* 410 U.S. at 87-91 (endorsing the fact/opinion distinction); *Quarles v. Department of Navy,* 893 F.2d 390, 392 (D.C.Cir.1990) (observing that "the prospect of disclosure is less likely to make an adviser omit or fudge raw facts, while it is quite likely to have just such an effect" on materials reflecting agency deliberations). "Purely factual reports and scientific studies cannot be cloaked in secrecy by an exemption designed to protect only 'those internal working papers in which opinions are expressed and policies formulated and recommended.'" *Bristol-Myers Company v. FTC,* 424 F.2d 935, 939 (D.C.Cir. 1970) (quoting *Ackerly v. Ley,* 420 F.2d 1336, 1341 (D.C.Cir.1969)).

Specifically, the D.C. Circuit has routinely held that factual information must be released. *Playboy Enterprises, Inc. v. Dep't of Justice*, 677 F.2d 931, 936 (D.C.Cir. 1982) (finding that the factual material in a government report was not protected under the deliberative process privilege and must be released); *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 858 (D.C. Cir. 1980) (holding that memoranda from regional counsel issued in response to requests for interpretations of regulations were not exempt under the deliberative process privilege because they were "straightforward explanations of agency regulations"); *see, e.g., Judicial Watch, Inc. v. U.S. Dept. of Treasury*, CIV.A. 09-01508 BAH, 2011 WL 2678930 (D.D.C. July 11, 2011)

(holding that headers at the top of several sets of minutes were factual and, hence, segregable and must be released),

The Defendant has wrongly withheld purely factual information. The Vaughn Index describes Document #5 as and email from Northeastern representative John Beaty that "outlines and attaches options related to potential test methodology and technology choices to be made, as well as the progression to develop concepts of operation for equipment…"  The information contained in this email is largely descriptive and factual. Beaty is not advising the agency, he is not giving opinions, he is simply relaying facts: what the options are, what the process is to develop concepts. Nothing in this Vaughn summary suggests that Beaty is issuing "advisory opinions, recommendations, and deliberations that are part of a process by which governmental decisions and policies are formulated." *Klamath Water Users,* 532 U.S. at 8.

The Defendant has also wrongly withheld purely factual information in Vaughn Index Document #8. This document is meeting minutes describing "options presented to DHS for moving forward with Phase II of system design, a variety of possible deployment scenarios, and the type of software that may need to be developed to effectively manage the system." Def.'s Motion for Summ. Judg. at 21. This document does not detail advisory opinions, recommendations, or deliberations. It simply describes factual details: what options are available, what deployment scenarios exist, and what the parameters are for management software. This document is not within the intended scope of deliberative process privilege.

Similarly, the Defendant's withholding of portions of Vaughn Index Document #17 is improper. This document details the "strengths and weaknesses of the prototype system," which is exactly the type of factual information that courts typically find is not protected by the deliberative process privilege.

C.      *Even if the Court Finds that Portions of the Documents Are Protected Under the Deliberative Process Privilege, the Unprotected Factual Portions Are Segregable and Should Be Released*

Even if the agency establishes that it has properly withheld portions of these documents under FOIA Exemption 5, "it must nonetheless disclose all reasonably segregable, nonexempt portions of the requested record(s)." *Roth v. U.S. Dep't of Justice,* 642 F.3d 1161, 1167 (D.C.Cir. 2011); *North v. U.S. Dep't of Justice,* 774 F.Supp.2d 217, 222 (D.D.C.2011) (citing *Oglesby v. U.S. Dep't of the Army,* 79 F.3d 1172, 1178 (D.C.Cir. 1996)). The agency bears the burden of demonstrating that withheld documents contain no reasonably segregable factual information. *Mokhiber v. U.S. Dept. of Treasury*, 335 F. Supp. 2d 65, 69 (D.D.C. 2004), *citing Army Times Pub. Co. v. Department of Air Force,* 998 F.2d 1067, 1068 (D.C.Cir. 1993); *Mead Data Central, Inc. v. U.S. Dept. of Air Force,* 566 F.2d 242, 260 (D.C.Cir. 1977). Here, the DHS has not clearly demonstrated in the Vaughn Index that the documents contain no reasonably segregable factual information.

Even if the Court finds that Rapiscan and Northeastern were consultants for the purposes of the "inter-agency or inter-agency" requirement, and even if the Court finds that portions of these records contain "advisory opinions, recommendations, and deliberations that are part of a process by which governmental decisions and policies are formulated," *Klamath Water Users,,* 532 U.S. at 8, all segregable factual portions of the records must still be released. *See Roth v. U.S. Dep't of Justice,* 642 F.3d at 1167. As discussed above, the Vaughn Index presented by the Defendant contains many references to information that is most likely factual. Thus, even if the Court finds that there is a section of Vaughn Index Document #17, for example, that contains an advisory opinion regarding what the agency should do about the weaknesses of the prototype

system, the agency must still disclose the underlying factual information: what the strengths and weaknesses were.

## II.    FOIA Exemption 4 Does Not Permit the Agency to Withhold Emails, Meeting Minutes, Briefing Materials, and Other Records

The DHS alleges that the emails, meeting minutes, and briefing materials discussed above are also exemption from disclosure under Exemption 4. The agency has also wrongly withheld additional information under Exemption 4, which protects "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). In order to qualify for this exemption, the information must meet all three requirements. The agency's withholdings in this case do not meet the third requirement: the information must be "privileged or confidential." *Id.*

### A.    *The Withheld Information is Not Subject to Exemption 4 Because it is Already Publicly Available*

In *National Parks and Conservation Ass'n v. Kleppe*, 498 F.2d 765 (D.C. Cir. 1974), the court found that the test for commercial information is an objective one requiring a showing of likely specific harm. Commercial or financial information is confidential "if disclosure of the information is likely to have either of the following effects: (1) to impair the government's ability to obtain the necessary information in the future or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained." *Id.* at 770.

Courts have found that "[p]ublic availability of information defeats an argument that the disclosure of the information would likely cause competitive harm." *Nat'l Cmty. Reinvestment Coal. v. Nat'l Credit Union Admin.*, 290 F. Supp. 2d 124, 134 (D.D.C. 2003). "To the extent that any data requested under FOIA are in the public domain, the submitter is unable to make any claim to confidentiality-a *sine qua non* of Exemption 4." *CNA Fin. Corp. v. Donovan*, 830 F.2d

1132, 1154 (D.C. Cir. 1987); *see also Worthington Compressors, Inc. v. Costle,* 662 F.2d 45, 51 (D.C. Cir. 1981) (finding that "[i]f the information is freely or cheaply available from other sources, such as reverse engineering, it can hardly be called confidential and agency disclosure is unlikely to cause competitive harm to the submitter"); *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 872 (D.C. Cir. 1992) (holding that information "will be treated as confidential under Exemption 4 if it is of a kind that the provider would not customarily make available to the public").

Despite its insistence that the public release of this information would harm its ability to compete, Rapiscan, itself, has already disclosed much of this information in widely available brochures, product information data sheets, and websites. This public availability negates the argument that disclosure would harm Rapiscan or impair the government's ability to obtain necessary information in the future. *Nat'l Cmty. Reinvestment Coal.,* F. Supp. 2d at 134.

The Vaughn Index doesn't specifically identify which particular security device is at issue here, but the Modica Declaration and Defendant's Motion for Summary Judgment indicate that it is the Secure 1000 and possibly the Wave 200. The Secure 1000 is the commonly used airport body scanner machine, which uses backscatter x-rays. The Wave 200 is a passive millimeter wave machine, designed for use in "high throughput inspection." Pl. Exhib. 6.

1.    *Secure 1000: Publicly Available Information*

As Plaintiff's Exhibits 3-5 demonstrate, Rapiscan has already publicly released many of the same details regarding the Secure 1000 that it is now attempting to claim are confidential. Plaintiff's Exhibit 3 is a promotional data sheet by Rapiscan for its Secure 1000 scanner. This brochure is publicly available on Rapiscan's website[1] and contains several classes of information

---

[1] http://www.rapiscansystems.com/en/products/item/productsrapiscan_secure_1000_dual_pose

that the agency has identified as "confidential" in the Vaughn Index and Motion for Summary Judgment: scan time (Vaughn Index Items #6-10, 12), inspection time (Vaughn Index Items #6-10, 12), design schematics (Vaughn Index Item #9, 10), detection abilities (Def.'s Motion for Summ. Judg. at 15), and images of how the system would identify threats (Vaughn Index Item #9).

Plaintiff's Exhibit 4 is a document available on the New York Office of General Services Website.[2] This document lists in detail the 2009 pricing for a variety of Rapiscan Products, including the "Secure 1000 (5000 Series) - Windows, standard resolution," and a variety of accessories for the system including the backdrop, operator table, and privacy algorithms. Similar information is also available elsewhere, including mainstream media sources, such as Bloomberg Businessweek. Pl. Exhib. 5. This is precisely the "unit pricing" information that the defendants are attempting to argue is confidential. Vaughn Index Item #8, 15; Def.'s Motion for Summ. Judg. at 15.

> 2.     *Wave 200: Publicly Available Information*

Plaintiff's Exhibits 6-7 demonstrate that many of the details regarding the Wave 200 have also already been publicly released. Plaintiff's Exhibit 6 is a promotional data sheet produced by Rapiscan. This data sheet contains several classes of information that the agency has identified as "confidential" in the Vaughn Index and Motion for Summary Judgment: frequency requirements (Vaughn Index Items #6-10), scan time (Vaughn Index Items #6-10), design schematics (Vaughn Index Item #9, 10), detection abilities (Def.'s Motion for Summ. Judg. at 15), and images of how the system would identify threats (Vaughn Index Item #9, 10).

---

[2] *www.ogs.state.ny.us/purchase/spg/pdfdocs/3823219745PL_Rapiscan.pdf*

Plaintiff's Exhibit 7 is an item from Bloomberg Businessweek, detailing unit pricing for the Wave 200. This is, again, the "unit pricing" information that the defendants are attempting to argue is confidential. Vaughn Index Item #8, 15; Def.'s Motion for Summ. Judg. at 15.

EPIC does not dispute certain agency withholdings, including employee information and specific cost breakdowns. But EPIC does dispute the withholding of the agency records described *supra*. The public availability of this information precludes the assertion of Exemption 4. *Nat'l Cmty.*, 290 F. Supp. 2d at 134.

B.      *Segregable Portions Must Be Released*

As discussed above, if a document contains exempt information, the agency must still release "any reasonably segregable portion" after deletion of the nondisclosable portions. 5 U.S.C. § 552(b); *Oglesby v. U.S. Dept. of Army*, 79 F.3d 1172, 1176 (D.C. Cir. 1996). The agency has withheld five records in full and four in part under Exemption b(4). The statute requires that any portions of these records that are not properly exempt must be released.

III.    **EPIC Is Entitled to Recover Its Costs and Fees**

A.      *EPIC "Substantially Prevailed" by Forcing Disclosure of DHS Records*

Irrespective of the outcome of the parties' cross-motions for summary judgment, EPIC is entitled to recover its fees and costs from the DHS in this matter. EPIC asks the Court to enter judgment as to EPIC's eligibility and entitlement to fees and to order further briefing as to the amount of costs and fees. "The court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed." 5 U.S.C. § 552(a)(4)(E). "A complainant has substantially prevailed if the complainant has obtained relief through … a voluntary or unilateral change in position by the agency, if the complainant's claim is not insubstantial." *Id*. The

determination of whether the plaintiff has "substantially prevailed" is "largely a question of causation." *Weisberg v. Dep't of Justice*, 745 F.2d 1476, 1496 (D.C. Cir. 1984); *Church of Scientology v. Harris*, 653 F.2d 584, 587 (D.C. Cir. 1981). The key inquiry is "did the institution and prosecution of the litigation cause the agency to release the documents obtained during the pendency of the litigation?" *Church of Scientology*, 653 F.2d at 587.

EPIC has already "substantially prevailed" in this lawsuit. As described above, EPIC filed its FOIA request concerning body scanners on November 24, 2010. On April 16, 2011, EPIC filed an administrative appeal challenging the DHS's wrongful withholding of documents. On May 20, 2011, EPIC filed this lawsuit challenging the agency's wrongful withholding of documents. On August 15, 2011, the agency disclosed an additional 151 pages of documents in their entirety and 21 pages in redacted form.  "The institution and prosecution" of this suit plainly "cause[d] the agency to release the documents obtained during the pendency of the litigation."

B.      *The Court Should Award EPIC Costs and Fees In This Case*

"The court should consider [four factors] in determining the appropriateness of an award of costs and attorney fees." *Cuneo v. Rumsfeld*, 553 F.2d 1360, 1365 (D.C. Cir. 1977). The four factors are: 1) "the benefit to the public, if any, deriving from the case;" 2) "the commercial benefit of the complainant;" 3) "the nature of [the complainant's] interest in the records sought"; and 4) "whether the government's withholding of the records sought had a reasonable basis in law." H. Comm. on Gov't Operations and S. Comm. on the Judiciary, 94th Cong., *Freedom of Information Act and Amendments of 1974 (Pub. L. No. 93-502) Source Book,* 189-90 (J. Comm. Print 1975).

"Public benefit" can be demonstrated by a "newsman . . . seeking information to be used in a publication or a public interest  group . . . seeking information to further a project benefiting

18

the general public." *Id*. at 171. The "public benefit" factor supports an award where the

complainant's victory is "likely to add to the fund of information that citizens may use in making

in making vital political choices." *Cotton v. Heyman*, 63 F.3d 1115, 1120 (D.C. Cir. 1995)

(citations omitted). D.C. District court has found that news media coverage is relevant for

determining "public benefit." *Elec. Privacy Info. Ctr. v. U.S. Dept. of Homeland Sec.*, 2011 WL

4014308 (D.D.C. Sept. 12, 2011).

EPIC's FOIA suit provided substantial benefit to the public. EPIC maintains two of the

most popular websites in the world - www.epic.org and www.privacy.org - for searches on the

term "privacy." EPIC disseminated the agency records it received on its www.epic.org web site[3]

and to the approximately 8,000 recipients of its bi-weekly newsletter.[4] EPIC's FOIA work in this

matter was prominently featured in a Forbes article:

> Giving Transportation Security Administration agents a peek under your clothes
> may soon be a practice that goes well beyond airport checkpoints. Newly
> uncovered documents show that as early as 2006, the Department of Homeland
> Security has been planning pilot programs to deploy mobile scanning units that
> can be set up at public events and in train stations, along with mobile x-ray vans
> capable of scanning pedestrians on city streets.

Andy Greenberg, "Documents Reveal TSA Research Proposal To Body-Scan Pedestrians," Train

Passengers, Forbes, Mar. 2, 2011.[5] Other news organizations reported on the agency's

development of mobile body scanners *See, e.g.,*. Thomas Frank, *Homeland Security Looked Into*

*Covert Body Scans*, USAToday, Mar. 3, 2011;[6] Jaikumar Vijayan, *DHS Seeks Systems for Covert*

---

[3] http://epic.org/2011/08/documents-reveal-new-details-a.html
[4] http://epic.org/alert/epic_alert_1818.html
[5] http://www.forbes.com/sites/andygreenberg/2011/03/02/docs-reveal-tsa-plan-to-body-scan-
pedestrians-train-passengers/
[6] http://www.usatoday.com/news/washington/2011-03-04-bodyscans04_ST_N.htm

*Body Scans, Documents Show*, ComputerWorld, Mar. 3, 2011.[7] Members of Congress have also demonstrated interest in the topic of mobile body scanners. Joe Pyrah, *Chaffetz: Mobile Scanners Invade Privacy*, The Daily Herald, Aug. 29, 2010.

"Commercial benefit to the complainant" might preclude an award if the beneficiary is a "large corporate interest (or a representative of such an interest)." *Freedom of Information Act and Amendments of 1974 Source Book* at 171. However, commercial benefit does not bar recovery "where the complainant was indigent or a nonprofit public interest group." *Id.* In fact, nonprofit organizations are "the sort of requester that Congress intended to recover attorney's fees under FOIA." *Elec. Frontier Found. v. Office of the Director of National Intelligence*, 2008 WL 2331959 (N.D. Cal. June 4, 2008). EPIC is a 501(c)(3) non-profit public interest research center. EPIC derived no commercial benefit from its FOIA request or lawsuit. The sole benefit was derived by the public, which benefited from the disclosure of the body scanner documents released in this case.

The "nature of the [complainant's] interest" factor is "closely related [to] and often considered together" with the commercial benefit criterion. *Tax Analysts v. Dep't of Justice*, 965 F.2d 1092, 1095 (D.C. Cir. 1992) Favored interests are "scholarly, journalistic or public-interest oriented." *Freedom of Information Act and Amendments of 1974 Source Book* at 171. *See Long v. IRS*, 932 F.2d 1309, 1316 (9th Cir. 1991) (holding that a lower court's ruling that the plaintiff's scholarly interest weighed against her recovery of fees was held "wrong as a matter of law and an abuse of discretion."). As set forth above, EPIC's interest in this matter is squarely within the "scholarly, journalistic or public-interest oriented" interests favored by the statute.

---

[7]

http://www.computerworld.com/s/article/9212681/DHS_seeks_systems_for_covert_body_scans_documents_show

*See, e.g., Elec. Privacy Info. Ctr. v. United States Dep't of Homeland Sec.,* 760 F. Supp. 2d 4, 44 (D.D.C. 2011) ("[EPIC's] aims, which include dissemination of information regarding privacy issues to the public, . . . fall within the scholarly and public-interest oriented goals promoted by FOIA, . . .")

The DHS did not have a "reasonable legal basis" for failing to disclose records to EPIC. The DHS's delay in replying to EPIC's request and appeal plainly violated the FOIA's statutory deadlines. *See* 5 U.S.C. § 552(a)(6)(A). As described in EPIC's Complaint, the DHS violated statutory deadlines by failing to make a timely determination concerning EPIC's administrative request and appeal. Compl. at ¶¶28-32. The DHS has cited no legal basis in opposition to EPIC's claims regarding the untimeliness of the agency's response. An agency's representation that records were not produced more quickly due to processing backlogs, confusion, and administrative error are "practical explanations, not reasonable legal bases" for withholding. *Miller v. Dep't of State*, 779 F.2d 1378, 1390 (8th Cir. 1985). "The FOIA does not contain a statutory exception for administrative inefficiency. When a private citizen is obliged to seek legal services in order to wrest from the government information which the government had no legal reason to withhold from him, he is entitled under the Act to be reimbursed for the cost to which he has been put." *Id.* Nor did DHS cite any legal basis for withholding the 172 pages of documents that it later disclosed on August 15, 2011.

In this case, EPIC was forced to sue the DHS in order to wrest from the government critical information concerning the DHS' mobile body scanner program. The DHS had no reason or legal basis to withhold these records. The agency must reimburse EPIC for its costs and fees.

## <u>CONCLUSION</u>

As discussed above, Defendant's Motion for Summary Judgment should be denied as to the withholdings under Exemption 5 and all segregable portions of documents withheld under Exemption 4. In addition, Plaintiff is entitled to recover its costs and fees because it has "substantially prevailed" in this case regardless of the outcome of the parties' cross-motions for summary judgment.  A proposed Order is attached.

<div align="center" style="float:right">

Respectfully submitted,

_____*/s/ John Verdi*_____
JOHN VERDI (DC Bar # 495764)
MARC ROTENBERG (DC Bar # 422825)
GINGER MCCALL (DC Bar # 1001104)
Electronic Privacy Information Center
1718 Connecticut Ave. NW
Suite 200
Washington, DC 20009
(202) 483-1140
*Counsel for Plaintiff*

</div>

Dated: September 22, 2011

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of September 2011, I served the foregoing PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT, including all exhibits and attachments, by electronic case filing upon:

    JAVIER M. GUZMAN
    Assistant United States Attorney
    U.S. Department of Justice


                    _____*/s/ John Verdi*_____
                    John Verdi
                    *Counsel for Plaintiff*