UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER, | ) ) ) ) |  |
| Plaintiff, | ) ) ) |  |
| v. | ) ) | Civil Action No.: 11-00945 (ABJ) |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, | ) ) ) ) |  |
| Defendant. | ) ) ) |  |

## DEFENDANT'S REPLY IN SUPPORT OF SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

EPIC, in its opposition and cross-motion for summary judgment, raises three claims, all of which lack merit. It first challenges DHS's withholding of three records under Exemption 5, arguing that they are not intra-agency communications and contain factual information that falls outside of the scope of the deliberative process privilege. Opp. at 5-14. But the authors of these records acted as consultants to DHS, rendering their communications intra-agency. And to the extent that the records contain "purely" factual information, that information is inextricably intertwined with the opinions and deliberations of DHS and its consultants that are reflected in the records.

Next, EPIC, although not purporting to challenge DHS's invocation of Exemption 4, asserts that records provided to DHS by Rapiscan cannot constitute confidential commercial information because that information is publicly available. Opp. at 14-17. But, as shown below, the public records culled by EPIC do not contain the same information withheld by DHS.

Finally, EPIC argues that it should be awarded litigation fees and costs by virtue of DHS's release of four records after this suit was filed. Opp. at 17-21. But EPIC is not eligible for or entitled to a fee award. It has not prevailed on a "non insubstantial" claim. Nor has it shown that the post-filing release of records has benefitted the public or that DHS has acted unreasonably.

**1.      *DHS has properly invoked Exemption 5.***

DHS is withholding three records, two in full and one in part, under Exemption 5 as records protected by the deliberative process privilege. *Vaughn* Index, Record Nos. 5, 8, 17 (Dkt. 9-2); Def.'s Mot. Summ. J (MSJ) at 18-22. EPIC argues that Exemption 5 is inapplicable because the records are not intra-agency documents and contain unprotected factual information. It is wrong on both counts.

**a.  *The documents prepared by Rapiscan and NEU are intra-agency records.***

Exemption 5 protects "intra-agency" documents "which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). The exemption's scope extends, as EPIC acknowledges, to documents prepared by outside consultants working for or on behalf of an agency. Opp. at 5; Def.'s MSJ at 19. EPIC, however, argues, citing *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1 (2001), that Rapiscan and NEU were not "neutral" consultants but rather "self-advocates" hoping to sometime in the future to sell explosives detection systems to the government. Opp. at 6-8. This argument misunderstands *Klamath* as well as the nature of the work done for DHS by Rapiscan and NEU.[1]

---

[1] Only two of three records withheld under Exemption 5 were prepared by Rapiscan or NEU. *Vaughn* Index, Record Nos. 5 & 8. The third record is a set of briefing materials prepared by DHS in evaluating Rapiscan's proposal, and is therefore intra-agency per se. *Id.*, Record No. 17.

*Klamath* arose from competition among several parties over water rights in a sparsely hydrated region.  The Department of Interior sought to develop a long range plan for water use within the Klamath Irrigation Project, which uses water from the Klamath River Basin to irrigate territory in Oregon and California.  532 U.S. at 5.  DOI asked the Klamath Tribe and three other Basin Tribes – all users of water from the project – to consult on the plan's development.  *Id*.  At about the same time, the Bureau of Indian Affairs, a DOI sub-agency, filed claims on behalf of the Klamath Tribe in an Oregon state court adjudication intended to allocate water rights.  *Id.* BIA, under federal statute, is charged with administering land and water held in trust for Indian tribes and, in that capacity, consulted with the Klamath Tribe to determine the scope of the claims to be submitted by BIA for the Tribe's benefit.  *Id*. at 5-6.

An association of water users, most of whom received water from the Klamath Irrigation Project and whose interests were adverse to the tribal interests due to the scarcity of water, filed FOIA requests seeking access to communications between DOI and the Basin Tribes, including documents prepared by the Tribes.  *Id*. at 6.  DOI withheld the documents, invoking Exemption 5 to protect the records as reflecting government deliberations.  *Id*.

Although acknowledging that Exemption 5 can apply to records prepared by consultants to an agency, the Court held that such records would not be considered "intra-agency" when the consultant is acting as a "self-advocate at the expense of others seeking benefits inadequate to satisfy everyone."  *Id*. at 12.  That was the case with respect to DOI's development of a water use plan and BIA's advocacy of the Klamath Tribe's water rights claims in the Oregon state court proceeding.  As the Court explained, the Basin Tribes who had consulted with DOI were "obviously in competition with non-tribal claimants, including those irrigators represented by [the FOIA requester] * * *, the water being inadequate to satisfy the combined demand."  *Id.* at

13.  Similarly, in the state court proceeding, BIA's decision "to support a claim by the [Klamath]

Tribe that is necessarily adverse to the interests of competitors" rendered the Tribe's position "a

far cry from the position of the paid consultant."  *Id*. at 14-15.

That adversary context – the touchstone of whether a consultant's records should be

considered intra-agency[2] – is absent here.  DHS created the Prototype and Techology for

Improvised Explosives Device Detection Program to advance the state of the art in explosives

and suicide bomber detection systems.  Undisputed Fact No. 2.[3]  Through a public

announcement, it invited interested parties to submit proposals to fulfill that goal and awarded

development contracts to Rapiscan and NEU.  *Id*.  Over the course of the contracts, Rapiscan and

NEU consulted with DHS officials concerning the progress of development so as to allow DHS

officials to make informed decisions on how to best develop a viable system.  *See* BAA 05-03

(Def.'s MSJ Ex. 1) (requiring contractors to submit monthly and quarterly progress reports on,

*inter alia*, "technical progress achieved against goals" and "difficulties encountered").  At

bottom, the records prepared by Rapiscan and NEU for DHS played essentially the same part in

DHS's deliberations as records prepared by DHS personnel may have done.  *See Klamath*, 532

U.S. at 10.

EPIC argues that Rapiscan and NEU cannot be considered disinterested consultants

because they were engaged in marketing efforts to the public and private sectors.  Opp. at 7-8.

This position, if correct, would render the retained consultant exception meaningless.  It is hard

to conceive of any consultants hired by a federal agency who do not engage in ongoing business

---

[2] *See Citizens for Responsibility and Ethics in Wash. (CREW) v. DHS*, 514 F. Supp. 2d 36, 44
(D.D.C. 2007) (upholding Exemption 5 claim with respect to contractor documents in the
absence of evidence that contractor acted in an adversarial capacity).

[3] In response to DHS's Statement of Material Facts Not in Genuine Dispute (Dkt. 9), EPIC
disputes a single fact – that DHS reviewed the withheld records after this action was filed in
order to determine whether additional records could be released so as to narrow the issues for
judicial review.  Pl.'s Response to Def.'s Statement of Facts Not in Genuine Dispute (Dkt. 10-3).

development efforts, if they want to remain in business.  Rather, as the Supreme Court noted in *Klamath*, an outside consultant need not be "devoid of a definite point of view when the agency contracts for its services" to have its records deemed intra-agency.  *Klamath*, 532 U.S. at 10.  So long as the consultant is obliged to "truth and offering its sense of what good judgment calls for," it "functions just as an employee would be expected to do." *Id.* at 11.  Such was Rapiscan and NEU's role as contractors under the PTIEDD Program, and nothing in the record suggests otherwise.

Finally, EPIC's attempt to analogize Rapiscan and NEU to the doctor in *Physicians Committee for Responsible Medicine v. NIH*, 326 F. Supp. 2d 19 (D.D.C. 2004), misses the mark. *See* Opp. at 7-8.  At issue in *Physicians Committee* was whether portions of a grant application, for which the submitting doctor was awarded a five-year grant, could be withheld under Exemption 5.  The court held no, finding that the doctor was not acting on the government's behalf when he submitted the application and that the research performed under that grant was a purely personal pursuit.  *Physicians Committee*, 326 F. Supp. 2d at 28, 29; *Physicians Committee for Responsible Medicane v. NIH*, No. 01-2666, slip op. at 1-2 (D.D.C. Feb. 4, 2004) (attached hereto as Ex. 1).  Here, in contrast, the withheld records were created *after* the contracts were awarded to Rapiscan and NEU, and for the purpose of advising DHS on the progress of development and the myriad decisions to be made in proceeding with subsequent development phases.

### b.   The withheld records were part of DHS's deliberative process.

EPIC argues that the three records are improperly withheld as deliberative process records because they contain factual information rather than opinions, recommendations or deliberations.  Opp. at 9-12.  EPIC reads the deliberative process privilege far too formalistically.

"To establish that it withheld documents pursuant to the deliberative process privilege, the agency must only identify what deliberative process is involved, and the role played by the documents in issue in the course of that process." *CREW*, 514 F. Supp. 2d at 45.  Thus, the scope of the privilege does not turn on whether the contents of a record are labeled "factual" or "deliberative," but rather on whether the record reflects an agency's deliberative process. *Nat'l Wildlife Fed. v. U.S. Forest Serv.*, 861 F.2d 1114, 1119 (9th Cir. 1988); *see Petroleum Info. Corp. v. Dep't of Interior*, 976 F.2d 1429, 1435 (D.C. Cir. 1997) (cautioning "against reflexive fact/opinion characterization as the way to decide the full range of Exemption 5 cases").  At any rate, even "purely" factual information is protected by the deliberative process privilege when it "is so inextricably intertwined with the deliberative sections of documents that its disclosure would inevitably reveal the government's deliberations" or when it "may so expose the deliberative process within an agency that the material is appropriately held privileged." *CREW*, 514 F. Supp. 2d at 46; *Judicial Watch, Inc. v. Dep't of Treasury*, --- F. Supp. 2d ---, 2011 WL 2678930, at *10 (D.D.C. July 11, 2011) (citing cases).

The deliberative process at issue here is DHS's deliberations with respect to the development of prototype explosive detection systems under the Rapiscan and NEU contracts. Medina Decl., ¶ 22 (Dkt. 9-2).  The withheld records set forth assessments and recommendations by these contractors and DHS for developing the systems.  More specifically, Record No. 5, an e-mail from a NEU official to his DHS counterpart, outlines "options related to potential test methodology and technology choices to be made, as well as the progression to develop concepts of operations for equipment once selected . . . for Phase II of the BomDetec program." *Vaughn* Index, Record No. 5.  Record No. 8, minutes of a meeting between Rapiscan and DHS officials, similarly provides "an outline of options for moving forward with the system design, internal

discussions about decisions needed to be made related to a variety of deployment . . . scenarios, and the types of software that may need to be produced to manage the system effectively." *Id.*, Record No. 8.  Record No. 17, internal briefing materials prepared by DHS in evaluating the Rapiscan proposal, summarizes DHS's own assessment of the "strengths and weaknesses of the prototype system and items for [DHS] to consider before moving with further development." *Id.*, Record No. 17.

Simply put, these records set forth DHS's deliberations about whether to proceed with Rapiscan's proposal, and the contractors' advice to DHS concerning the ongoing development of the prototype systems.  To the extent that these records identify facts, they do so in the context of recommendations and assessments provided to DHS decision-makers.  These facts are as fully protected by the deliberative process privilege as the accompanying opinions.  *CREW*, 514 F. Supp. 2d at 46 (finding reports, timelines, and list of matters developed as part of FEMA's ongoing response to Hurricane Katrina protected); *Bloomberg, L.P. v. SEC*, 357 F. Supp. 2d 156, 169 (D.D.C. 2004) (finding exempt documents that distilled facts from meetings reflecting impressions of agency officials); *Nat'l Wildlife Fed.*, 861 F.2d at 1121.[4]

**2.      *DHS has properly invoked Exemption 4.***

DHS is withholding nine records, five in full and four in part, under Exemption 4, as confidential commercial information.  *Vaughn* Index, Record Nos. 6-10, 12, 15-17.  As explained in its motion for summary judgment, DHS withheld the records on two independent grounds:  release would (1) cause substantial competitive harm to Rapiscan and (2) impair DHS's research and development efforts.  Def.'s MSJ at 13-18; *see Nat'l Parks and*

---

[4] Defendant believes that the record adequately demonstrates that Record Nos. 5, 8 and 17 are properly withheld as deliberative process materials under Exemption 5.  But if the Court finds the record to be insufficient in that regard, Defendant is willing to submit the records for in camera inspection under 5 U.S.C. § 552(a)(4)(B).

*Conservation Ass'n v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974) (holding that commercial information qualifies as confidential if disclosure would likely "cause substantial harm to the competitive position" of the person from whom it was obtained, or "impair the Government's ability to obtain necessary information in the future").

EPIC takes issue with the first ground, but ignores the second. Thus, the Court can grant summary judgment in DHS's favor with respect to Exemption 4 based on the second ground alone. *Bancoult v. McNamara*, 227 F. Supp. 2d 144, 149 (D.D.C. 2002) ("if the opposing party files a responsive memorandum, but fails to address certain arguments made by the moving party, the court may treat those arguments as conceded, even when the result is dismissal of the entire case").

DHS is equally entitled to summary judgment on the first ground. EPIC argues that the withheld Rapiscan commercial information is publicly available and therefore not confidential, offering as support promotional materials and a price list obtained from a New York state government website. Opp. at 15-17 & Exs. 3-5. But EPIC is wrong, as explained by Peter Kant, Executive Vice President at Rapiscan. *See* Declaration of Peter Kant (Kant Decl.) (attached as Ex. 2 hereto).

EPIC's Exhibit 3 is a marketing sheet about the Rapiscan Secure 1000. Dkt. 11-6. This document reflects certain generic performance information, for example, stating that the Secure 1000 has a scan rate of "*[l]ess than 7 seconds per view*." *Id.*; Kant Decl., ¶ 4. The withheld information, in contrast, discloses the precise scan rate that Rapiscan has achieved for purposes of the DHS effort. Kant Decl., ¶ 4. That precise rate is highly sensitive competitive information that competitors could use to try to undercut Rapiscan's advantage with respect to scan time. *Id.*

EPIC's Exhibit 4 is a 2009 commercial price list for several Rapiscan products, including the Secure 1000, under a contract with New York State.  Dkt. 11-7; Kant Decl., ¶ 5.  EPIC mistakenly argues that this price list demonstrates that EPIC does not treat its "unit pricing as confidential information.  Opp. at 16.  This list, which was made public by the state rather than Rapiscan, simply shows the pricing set by a state contract.  Kant Decl., ¶ 5.  Rapiscan's pricing, however, is very specific to each procurement.  As Mr. Kant avers:

> For any given acquisition, Rapiscan must make competitive business decisions regarding the price that it needs to offer to best enhance its chances of receiving an award.  Those judgments are procurement specific.  Thus, while the standard commercial price list contained in Exhibit 4 may not be sensitive, the pricing that Rapiscan proposes in a given DHS procurement certainly is, and Rapiscan goes to great lengths to ensure that such information is kept confidential.

*Id.*

EPIC's Exhibit 5 is an item from Bloomberg Businessweek that provides an overview of available passenger screening systems.  Dkt. 11-8.  This information is highly generic and does not include any of the information withheld or any other confidential or competitively sensitive information.  Kant Decl., ¶ 6.

In short, the publicly available documents cited by EPIC do not contain the same type of information withheld here, and in no way do they undercut the confidential nature of that information.[5]

### 3.    *EPIC is not entitled to attorney's fees or litigation costs.*

FOIA provides that courts may assess reasonable attorney's fees and litigation costs incurred in any case "in which the complainant has substantially prevailed."  5 U.S.C. § 552(a)(4)(E)(i).  Courts have interpreted FOIA's fee provision to require a two-step inquiry.  One

---

[5] EPIC submits publicly available information about another Rapiscan product, the WaveScan 200.  Dkt. 11-9 & 11-10.  The WaveScan 200 was not part of the PTIEDD Program and no information concerning it has been withheld.  Kant Decl., ¶ 7.

must first determine whether the requester is eligible for fees, and, only if so, whether the requester is entitled to them. *Brayton v. Office of the U.S. Trade Rep.*, 641 F.3d 521, 524 (D.C. Cir. 2011). EPIC's claim for fees and costs should be rejected on both grounds. To date, EPIC is not a substantially prevailing party. Even if it were, it is not entitled to fees because DHS's withholding decisions had a reasonable basis in law.

No court order or judicially enforceable agreement has been entered in this action with respect to any of EPIC's claims. Thus, EPIC may only be deemed a substantially prevailing party if it can show "a voluntary or unilateral change in position by [DHS], *if* [EPIC's] claim is not insubstantial." 5 U.S.C. § 552(a)(4)(E)(ii) (emphasis added). Here, the only post-filing action cited by EPIC is DHS's release of four NEU records withheld under Exemption 4. Opp. at 18. Most of the releasable records sought by EPIC were released before it filed suit. Undisputed Fact Nos. 12-13 (explaining that pre-suit DHS released 15 pages of records in full, 158 pages in part, and withheld 20 records). On August 15, 2011, after EPIC filed suit, DHS, after conferring with NEU, released four additional records which had been withheld as NEU's confidential commercial information. Undisputed Fact No. 14; Opp. at 18; Aug. 15, 2011 Release Letter (attached hereto as Ex. 3). Nothing in the record or EPIC's assertions suggest that these latter records have provided any vital information to the public. *See* Opp. at 19-20 (asserting that this suit has provided substantial benefit to the public but citing only to media articles about body scanner issue published before filing of suit). *See Hersh & Hersh v. HHS*, No. C 06-4234, 2008 WL 2725497, at *2 (N.D. Cal. July 10, 2008) (requester's claim was not "not insubstantial" where small amount of information was released post-filing, none of which was critically important to public); *Dasta v. Lappin*, 657 F. Supp. 2d 29, 33 (D.D.C. 2009)

(finding that requester was not a substantially prevailing party based on absence of public benefit from records released).[6]

EPIC's litigation position further underscores the absence of a not insubstantial claim. EPIC has confined its challenge to three records withheld under Exemption 5, and, sub silentio, taken issue with the Rapiscan records withheld under Exemption 4.  EPIC does not contest the adequacy of the DHS's search or the withholdings under Exemptions 3 and 6.  Measured against these facts, EPIC's claim with respect to the released NEU records should not be considered "not insubstantial."  *Hersh & Hersh*, 2008 WL 2725497, at *2 (noting as factor in denying fees and costs to requester that summary judgment had been granted in agency's favor on majority of claims).

Even if EPIC is eligible to recover fees and costs by virtue of DHS's post-filing release of NEU records, EPIC is not entitled to such a recovery.  A court considers at least four criteria in determining fee entitlement:  "(1) the public benefit derived from the case; (2) the commercial benefit to the plaintiff; (3) the nature of the plaintiff's interest in the records; and (4) the reasonableness of the agency's withholding of the requested documents."  *Davy v. CIA*, 550 F.3d 1155, 1159 (D.C. Cir. 2009).  Both the absence of public benefit and the reasonableness of DHS's withholding of NEU records cut against a fee award.

As explained above, EPIC has not demonstrated any benefit accruing to the public as a result of DHS's post-filing release of records.  Furthermore, DHS's position was reasonable. The reasonableness factor considers whether an agency has taken a position with a "reasonable basis in law" and whether it has been "recalcitrant in its opposition to a valid claim or otherwise engaged in obdurate behavior."  *Davy*, 550 F.3d at 1162 (internal citations omitted).  DHS's

---

[6] Notably, EPIC's website does not discuss these records or mention their release. www.epic.org/privacy/airtravel/backscatter (last visited Oct. 7, 2011)

decision not to release certain NEU records without first consulting NEU was reasonably grounded in the law. Exemption 4 is intended to protect the interests of both the government and submitters of information. *Nat'l Parks*, 498 F.2d at 767-70. When presented with a request for commercial information that may be confidential, FOIA guidelines advise that the submitter should be notified by the agency and given an opportunity to weigh in prior to release. See FOIA Update, Vol. XIV, No. 2 at 7 ("Exemption 4 Under Critical Mass: Step-By-Step Decisionmaking") (Spring 1993).[7] Indeed, failure to do so may subject an agency to suit by a submitter to prevent the release of information. *See CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1133 n.1 (D.C. Cir. 1987). Finally, there is no evidence to suggest that DHS acted obdurately or in bad faith. EPIC therefore is not entitled to fees.[8]

<u>**CONCLUSION**</u>

For the reasons stated herein and in the Motion for Summary Judgment, the Court should grant summary judgment in Defendant's favor.

Respectfully submitted,

RONALD C. MACHEN JR., D.C. Bar #447889
United States Attorney

RUDOLPH CONTRERAS, D.C. Bar #434122
Chief, Civil Division

By: ___/s/_____
JAVIER M. GUZMAN, D.C. Bar #462679
Assistant United States Attorney

---

[7] Available at www.justice.gov/oip/foia_updates/Vol_XIV_2/page4.htm.

[8] EPIC argues that DHS has failed to release segregable information from the records withheld under Exemptions 4 and 5. Opp. at 13, 17. But the record shows otherwise. DHS has narrowly applied various exemptions, resulting in the partial release of a number of records. It has also re-reviewed the records to ensure that all reasonably segregable information has been released. Def.'s MSJ at 24-25. EPIC need not engage in a further review when doing so would only result in the release of disjointed words, phrases or sentences that convey minimal information. *Mead Data Central, Inc. v. Dep't of Air Force*, 566 F.2d 242, 261 n.55 (D.C. Cir. 1977).

555 4th Street, N.W.
Washington, D.C. 20530
Tel: (202) 616-1761
Fax: (202) 514-8780
Javier.Guzman2@usdoj.gov

*Of counsel:*
Marshall L. Caggiano, Esq.
Office of General Counsel
Science & Technology Directorate
Department of Homeland Security