# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

ELECTRONIC PRIVACY
INFORMATION   CENTER,

                   **Plaintiff,**

       **v.**

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY,

                 **Defendant.**

**Civil Action No. 11-945 (BJR)**
MEMORANDUM OPINION GRANTING
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT, DENYING
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT, AND GRANTING
PLAINTIFF'S MOTION FOR
ATTORNEY'S FEES AND COSTS

This action concerns a Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq.*, request.  Plaintiff the Electronic Privacy Information Center ("EPIC") challenges defendant United States Department of Homeland Security's ("DHS" or "the department") response to its FOIA request seeking certain DHS records related to the agency's plans to utilize body scanner technology in the context of surface transportation.  Before the court are [Dkt. ## 9, 10] parties' cross-motions for summary judgment and EPIC's motion for attorney's fees and costs.  For the reasons set forth below, the court concludes that DHS's motion for summary judgment should be granted and EPIC's motion for summary judgment denied.  The court further concludes that EPIC is eligible for and entitled to attorney's fees and costs.

# I.   BACKGROUND

**A.**   **DHS Testing of Whole Body Imaging Technology**

In 2005, the Transportation Security Administration ("TSA"), a branch of the DHS, began testing Whole Body Imaging ("WBI") technology in U.S. airports with the goal of using WBI to screen commercial aircraft travelers.   Compl. ¶ 5; Answer ¶ 5.   WBI devices use either backscatter[1] x-ray or millimeter wave technology to capture three-dimensional images of individuals.   Compl. ¶ 6; Answer ¶ 6.   Body scanner devices have also been tested at surface transportation stations in the U.S. and abroad.   Compl. ¶ 8; Answer ¶ 8.   In 2006, machines utilizing both active and passive millimeter wave technology were tested on PATH train riders at a New Jersey train station.[2]   Compl. ¶ 9-10; Answer ¶ 9-10.   Beyond these facts, the parties dispute the extent of DHS's public testing of WBI technology in surface transportation.

**B.**   **DHS's Involvement in Research and Development of Whole Body Imaging Technology**

The Homeland Security Advanced Research Projects Agency ("HSARPA") is the external funding arm for DHS's Science and Technology Directorate ("S&T").   Def.'s Statement of Genuine Facts Not in Material Dispute ¶ 1.   HSARPA invests in new technologies that promote homeland security.   Towards this end, the agency awards procurement contracts for research or the development of prototypes to public and private entities, businesses, and universities.   Def.'s Statement of Genuine Facts Not in Material Dispute ¶ 1.   In December 2004,

---

[1]   According to DHS, backscatter scanning is "an advanced X-ray imaging technology capable of being used to detect hidden explosives and weapons on transit passengers."   Def.'s Mot at 3, n.2.

[2]   "PATH" is the (understandably) imprecise acronym for "Port Authority of New York & New Jersey."

HSARPA issued Broad Agency Announcement ("BAA") 05-03, announcing the creation of the Prototypes and Technology for Improvised Explosives Device Detection ("PTIEDD") Program. *Id.* ¶ 2; Aug. 18, 2011 Declaration of Rebecca Medina ("Medina Aug. 2011 Decl.") ¶ 3.[3] PTIEDD aimed to develop and improve existing systems capable of detecting explosive compounds in vehicles, and to support research and development of other technologies for detecting improvised explosive devices ("IEDs") in vehicles, left-behind packages, or carried by suicide bombers. *Id.* BAA 05-03 invited parties to "submit proposals for developing working prototypes of explosive detection devices and novel technologies and devices that would advance the state of the art." *Id.* In May 2006, HSARPA amended BAA 05-03 to invite submissions for a "prototype electro-imaging device capable of detecting concealed explosives and weapons." *Id.* ¶¶ 2, 4.

According to Medina, the BAA 05-03 bidders were required to register and submit proposals online at a password-protected website, with all data uploaded to the website protected from public view or download. *Id.* ¶ 3. Furthermore, all submissions were considered proprietary/source selection sensitive. *Id.* HSARPA awarded two contracts under BAA 05-03. The first was to Northeastern University ("NEU") to assess the state of the art in explosives detection technology and its adaptability to mass transit scenarios. *Id.* ¶¶ 5-6. The other contract went to Rapiscan, Inc. ("Rapiscan") to explore how its portal-based detector system might be adapted for standoff detection in mass transit threat scenarios. Both these contracts ended in

---

[3]     Ms. Medina is a senior policy advisor in the Explosives Division ("EXD") within S&T. She supervised the processing of the FOIA request at issue. Def.'s Statement of Genuine Facts Not in Material Dispute ¶2, n.1.

2008, and S&T's Explosives Division ("EXD"), which succeeded HSARPA in managing the

PTIEDD program, decided to terminate it.  *Id.*

C.      **EPIC's FOIA Request and DHS's Response**

On November 24, 2010, EPIC submitted a FOIA request to DHS seeking certain records

pertaining to DHS's activities in developing and using explosives detection systems.

Specifically, EPIC sought seven categories of records:

1.  All documents detailing plans by federal law enforcement agencies to implement body scanner technology in the surface transportation context.

2.  All contracts, proposals, and communications with private transportation and shipping companies (including, but not limited to NJ PATH, Amtrak, and Greyhound) regarding the implementation of body scanner technology in surface transit.

3.  All contracts, proposals, and communications with states, localities, tribes, and territories (and their subsidiaries or agencies) regarding the implementation of body scanners in surface transportation.

4.  All documents detailing plans by federal law enforcement agencies to use 'Z Backscatter Vans" or similar technology.

5.  All contracts, proposals, and communications with the manufacturers of the 'Z Backscatter Vans" or similar chronology.

6.  All contracts, proposals, and communications with states, localities, tribes, and territories (and their subsidiaries or agencies) regarding the implementation of 'Z Backscatter' or similar technology.

7.  All images generated by the 'Z Backscatter Vans' or body scanner technology that has been used in surface transit systems.

Compl. ¶ 16.

According to DHS, EXD staff first identified 21 records, comprising approximately 1,100 pages, as potentially responsive to EPIC's request.  Def.'s Statement of Genuine Facts Not in Material Dispute ¶ 14.  S&T then informed EPIC that it had located 1,156 pages of records responsive to the FOIA request.  Initially, the agency released 15 pages in full, 158 pages in redacted form, and withheld 983 pages in their entirety.  DHS invoked FOIA Exemptions 3, 4, 5, and 6 to justify its decisions to withhold information.  *Id.* ¶ 17; *see also Vaughn* Index (Attachment 1 to Medina Aug. 2011 Decl.).  It listed these documents and the justification for the claimed exemptions in a *Vaughn* Index.[4]

EPIC then filed an administrative appeal, challenging the S&T's partial withholding of 158 pages of documents and the S&T's complete withholding of 983 pages of documents.  The agency failed to comply with the statutory deadline to reply to this appeal.  EPIC then initiated this lawsuit.

After the commencement of this litigation, DHS disclosed two more records in full (an additional 151 pages in their entirety) and two more records in part (21 pages in redacted form).  According to DHS, these additional disclosures were the fruit of DHS's additional review of the withheld records to determine whether any additional non-exempt information could be reasonably segregated and disclosed.  It claims that it undertook such a review "[i]n an effort to

---

[4]     Under *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), agencies must prepare an itemized index that correlates each withheld document with a specific FOIA exemption and a justification for the withholding.

narrow the issues for judicial review." Def.'s Statement of Genuine Facts Not in Material

Dispute ¶ 14; *see also* Medina July 2011 Decl. ¶ 25.  EPIC disputes this justification.

In its motion for summary judgment, DHS also explains in cursory fashion why portions

of partially disclosed documents had been redacted.  Finding this segregabilty analysis

insufficient, this court ordered DHS to submit an adequate justification for the department's

redactions.  *See* Memorandum Order of May 11, 2012 [Dkt. # 19].  Accordingly, DHS filed a

supplemental declaration of Rebecca Medina, which explains the methods that the department

employed to review and redact the documents and the basis for the department's withholdings.

Notice of Filing, May 31, 2012 ("Medina May 2012 Decl.").

In addition, on June 6, 2012, DHS notified the court that it had found another responsive

record, in the form of a 174-page report prepared by NEU, pursuant to a contract the DHS

awarded it under Broad Agency Announcement 05-03.  Curiously, the department states that

S&T located this record while searching for records in response to an "unrelated FOIA request

submitted by EPIC."  Medina Decl., July, 24, 2012 ¶ 3 ("Medina July 2012 Decl.").  DHS claims

that part of the information contained is subject to Exemption 4 because it contains proprietary

information.  According to DHS, the withheld information relates to the progress made in

evaluating four sensors as well sensor design, capabilities and test results.  ASE, one of NEU's

two "industrial partners," stated to DHS that it considers this information confidential

commercial information, which if released, would cause substantial competitive harm to ASE

and place it at a disadvantage on future contracts.  Medina July 2012 Decl. ¶ 6. As well, DHS

states that the report contains information on how "both hardware and data integration of the

sensors would have been integrated if the program moved forward from Phase I, which it did not." Medina July 2012 Decl. ¶ 6.  DHS further asserts that it conducted a segregability analysis for releasable material within this report and that all reasonably segregated material has been released.  *Id.* ¶ 7.[5]  It has also filed an updated *Vaughn* Index.  The court ordered EPIC to file a response, if it had one, by August 1, 2012.  *See* Order of July 25, 2012.  EPIC did not reply.

Thus, in sum, a total of 21 records have been determined to be responsive to EPIC's FOIA request.  DHS has withheld 18 records in full or in part.  Def.'s Statement of Genuine Facts Not in Material Dispute ¶ 14;  Def.'s Notice of Filing Additional Record, June 6, 2012.  The department maintains that it has fulfilled all of FOIA's requirements by conducting an

---

[5]     DHS asserts in its notice that was mistaken in redacting certain names. Medina avers the following:

> The redactions  involved the names of two contractor employees, one for ASE and the other for Siemens (a  subcontractor). The redaction of the Siemens employee's  name was an error because its release was  not objected to by Siemens. The name of the Siemens employee will therefore be released.  However, it is my understanding that ASE objected to its employee's name being released because ASE considers him to be "key personnel." ASE asserted that its release could make him the target of ASE's competitors and risk him being hired away from ASE.  Therefore, ASE considers his name to be proprietary commercial information that should not be released. Further, the second error in the NEU report released  to EPIC erroneously labeled this redaction as under the Exemption b(6), when it should have been labeled  under Exemption b(4). DHS will make these corrections immediately and release to EPIC an corrected  version of the report.

Medina July 2012 Decl. ¶ 7.

The court is not aware that such a release has been made.

adequate search for responsive documents properly asserting Exemptions 3, 4, 5, and releasing

all reasonably segregable information.[6]

**D.     EPIC's Complaint**

EPIC challenges DHS's reliance on Exemptions 4 and 5, and contends that it is entitled to

an award of attorney's fees and costs.  EPIC also argues that DHS has not properly segregated

materials that are not exempt from disclosure.  In limiting its challenge to these exceptions, EPIC

concedes that DHS's search was adequate and that DHS properly withheld certain records under

Exemption 3.  EPIC asks the court to order DHS to produce all records responsive to its FOIA

request and award EPIC attorney's' fees and costs incurred.  Compl. at 7.

## II.  LEGAL STANDARDS

**A.     The Freedom of Information Act**

FOIA was enacted so that citizens could discover "what their government is up to."  *U.S.*

*Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989).  "The

basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic

society, needed to check against corruption and to hold the governors accountable to the

governed."  *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978).  FOIA "is broadly

conceived," *EPA v. Mink*, 410 U.S. 73, 80 (1973), and its "dominant objective" is "disclosure,

not secrecy," *U.S. Dep't of Def. v. FLRA*, 510 U.S. 487, 494 (1994) (quoting *Dep't of Air Force*

---

[6]      During this additional review, DHS also determined that it erroneously charged EPIC
$7.30 for processing — *i.e.* conducting a search and review of the request. Medina Aug. 2011
Decl. ¶ 26.  DHS waived that charge.  *Id.*  Also, one record that was initially identified as
responsive — a 312-page study called "DHS S&T Countermeasures Test Beds ('CMTB') Rail
Security Pilot Final Report"— was upon further review determined not to be responsive to any
of the seven categories in EPIC's FOIA request.  Medina Aug. 2011 Decl. ¶ 15.

v. *Rose*, 425 U.S. 352, 361 (1976)).  "At all times, courts must bear in mind that FOIA mandates a 'strong presumption in favor of disclosure . . . .'"  *Nat'l Ass'n of Home Builders v. Norton,* 309 F.3d 26, 32 (D.C. Cir. 2002) (quoting *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991)).

An agency may withhold information responsive to a FOIA request only if the information falls within an enumerated statutory exemption.  5 U.S.C. § 552(b).  These exemptions "are to be narrowly construed," *FBI v. Abramson*, 456 U.S. 615, 630 (1982), and the district court must conduct a *de novo* review of the record.  5 U.S.C. § 552(a)(4)(B).  "Unlike the review of other agency action that must be upheld if supported by substantial evidence and not arbitrary and capricious, the FOIA expressly places the burden 'on the agency to sustain its action' and directs the district courts to 'determine the matter de novo.'"  *Reporters Comm.*, 489 U.S. at 755 (quoting 5 U.S.C. § 552(a)(4)(B)).

As well, because the focus of FOIA is "information, not documents . . . an agency cannot justify withholding an entire document simply by showing that it contains some exempt material."  *Krikorian v. Dep't of State*, 984 F.2d 461, 467 (D.C. Cir. 1993) (citation and internal quotation marks omitted).  Instead, FOIA requires that federal agencies provide to a requester all non-exempt information that is "reasonably segregable" from exempt information.  5 U.S.C. § 552(b); *Mead Data Central, Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977) (citations and internal quotation marks omitted).

**B.**     **Summary Judgment**

FOIA cases are typically decided on motions for summary judgment.  *Moore v. Bush*,

601 F. Supp. 2d 6, 12 (D.D.C. 2009) (citing *Miscavige v. IRS*, 2 F.3d 366, 368 (11th Cir. 1993); *Rushford v. Civiletti*, 485 F. Supp. 477, 481 n.13 (D.D.C. 1980)).  A motion for summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The movant must support its factual positions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials."  FED. R. CIV. P. 56(c)(1)(A); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Factual assertions in the moving party's affidavits or declarations may be accepted as true unless the opposing party submits its own affidavits, declarations, or documentary evidence to the contrary.  *See Neal v. Kelly*, 963 F.2d 453, 456 (D.C. Cir. 1992).

In the FOIA context, a defendant agency seeking summary judgment in a FOIA case must demonstrate that no material facts are in dispute and that each responsive record that it has located has been produced to the plaintiff or is exempt from disclosure under one of the exemptions enumerated in 5 U.S.C. § 552(b), or else "inextricably intertwined with" exempt information (and therefore not reasonably segregable).  *Clemente v. F.B.I.*, 2012 WL 1245656, at *5 (D.D.C. Apr. 13, 2012) (citing *Mead Data*, 566 F.2d at 260); *accord Students Against Genocide v. U.S. Dep't of State*, 257 F.3d 828, 833 (D.C. Cir. 2001).  As well, "[b]ecause FOIA challenges necessarily involve situations in which one party (the government) has sole access to

the relevant information, and that same party bears the burden of justifying its disclosure

decisions, the courts . . . require the government to provide as detailed a description as possible-

without, of course, disclosing the privileged material itself-of the material it refuses to disclose."

*Oglesby v. U.S. Dep't of Army*, 79 F.3d 1172, 1178 (D.C. Cir. 1996).  This justification is

typically contained in a declaration or affidavit including a *Vaughn* index, the purpose of which

is "to permit adequate adversary testing of the agency's claimed right to an exemption," *Nat'l*

*Treasury Emps. Union v. U.S. Customs Service*, 802 F.2d 525, 527 (D.C. Cir. 1986) (citing *Mead*

*Data*, 566 F.2d at 251).  While there is no set formula, the index must contain "an adequate

description of the records" and "a plain statement of the exemptions relied upon to withhold each

record." *Id*. at 527 n.9.  An agency's affidavits or declarations are presumed to be submitted in

good faith.  *See SafeCard Servs., Inc. v. S.E.C.*, 926 F.2d 1197, 1200 (D.C. Cir. 1991).

Courts must view the facts in the light most favorable to the FOIA requester and

"ascertain whether the agency has sustained its burden of demonstrating that the documents

requested . . . are exempt from disclosure." *Assassination Archives & Research Ctr. v. Cent.*

*Intelligence Agency*, 334 F.3d 55, 57 (D.C. Cir. 2003) (internal quotation marks omitted).  If

courts find that any records were improperly withheld, they may order their production.  5 U.S.C.

§ 552(a)(4)(B).

## III.  ANALYSIS

Applying the appropriate legal standards, the court proceeds to examine the merits of the

parties' arguments as to FOIA exemptions 4 and 5 arguments.  It then determines whether or not

DHS has conducted an adequate segregability analysis.  Finally, the court analyzes whether or not EPIC is entitled to attorney's fees and costs.

**A.      FOIA Exemption 4 Covers the Withheld Documents**

**1.      DHS Has Shown Risk of Competitive Harm and Impairment of Government Research**

DHS has withheld ten records, five in full and five in part, pursuant to Exemption 4 and, in some instances, in conjunction with other exemptions.  *See Vaughn* Index, Record Nos. 6–10, 12, 15–18.  Exemption 4 provides that FOIA's disclosure requirements do not apply to matters that are "trade secrets and commercial or financial information obtained from a person and privileged or confidential."  5 U.S.C. § 552(b)(4).  DHS argues that Exemption 4 applies because the releasing document would: (1) cause substantial competitive harm to Rapiscan and ASE; and (2) impair DHS's research and development efforts.  Def.'s Mot. for Summ. J. at 13–18.  EPIC contends that Exemption 4 does not protect the documents in full because the information DHS seeks to withhold pursuant to this exemption is already publicly available, and thus cannot be considered privileged or confidential.  EPIC also asserts that even if some documents are protected from disclosure under Exemption 4, DHS has not complied with FOIA's requirement that agencies must release "any reasonably segregable portion" after deletion of the nondisclosable portions.  5 U.S.C. § 552(b).[7]  The department disagrees in all respects, countering that none are in fact public and that the public records culled by EPIC do not contain

---

[7]      EPIC does not dispute DHS's withholdings as to employee information and specific cost breakdowns.  *See* Pl.'s Opp'n. at 17.

the same information withheld by DHS.  It also maintains that its segregability analysis is sufficient.  DHS's arguments are more persuasive.[8]

"Public availability of information defeats an argument that the disclosure of the information would likely cause competitive harm." *Nat'l Cmty. Reinvestment Coal. v. Nat'l Credit Union Admin.*, 290 F. Supp. 2d 124, 134 (D.D.C. 2003).  "To the extent that any data requested under FOIA are in the public domain, the submitter is unable to make any claim to confidentiality-a *sine qua non* of Exemption 4."  *CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1154 (D.C. Cir. 1987); *see also Worthington Compressors, Inc. v. Costle*, 662 F.2d 45, 51 (D.C. Cir. 1981) (finding that "[i]f the information is freely or cheaply available from other sources, such as reverse engineering, it can hardly be called confidential and agency disclosure is unlikely to cause competitive harm to the submitter"); *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 872 (D.C. Cir. 1992) (holding that information "will be treated as confidential under Exemption 4 if it is of a kind that the provider would not customarily make available to the public.").  EPIC maintains that the information it requested falls into this category of already-public information.  It contends that Rapiscan has already

---

[8]      Contrary to DHS's argument that EPIC is "not purporting to challenge DHS's invocation of Exemption 4," Def.'s Rep at 12, and that this objection was made "sub silentio," *id*. at 11, EPIC properly asserted a challenge to DHS's invocation Exemption 4.  EPIC challenged DHS's invocation of this exemption in it motion for summary judgment, which states, in relevant part, that "[t]he Agency has Wrongly Withheld Information Under Exemption 4."  Pl.'s Mot. for Summ. Jud. at 14; *see also id*. at 22 ("As discussed above, Defendant's Motion for Summary Judgment should be denied as to the withholdings under Exemption 5 and all segregable portions of documents withheld under Exemption 4"); Pl.'s Proposed Order [Dkt. # 10], Text of Proposed Order, ("ORDERED that Defendant disclose to Plaintiff, within seven (7) days of the date of this order, all documents withheld under Exemption 5 and all segregable portions of documents withheld under Exemption 4").

disclosed much of this information in widely available brochures, product information data sheets, and websites and that this public availability negates Rapiscan's argument that disclosure would harm the company or impair the government's ability to obtain essential information in the future.[9]

In support of its argument, EPIC submits two Rapiscan documents that are publicly available: (1) a promotional data sheet by Rapiscan for its Secure 1000 scanner which is available on Rapiscan's website, Pl.'s Mot. for Summ. J., Ex. 3, (2) a document available on the New York Office of General Services Website which lists the 2009 pricing for a variety of Rapiscan Products and a variety of accessories for the system including the backdrop, operator table, and privacy algorithms, *id.*, Ex. 4. According to EPIC, the data sheet contains several classes of information that DHS has identified as "confidential" in the *Vaughn* Index and the department's Motion for Summary Judgment. As for the 2009 pricing document, EPIC contends that Rapiscan's price list posted on the New York state website is "precisely the 'unit pricing' information that the defendants are attempting to argue is confidential." DHS contests the premise of EPIC's argument — *i.e.* that the publicly available information in the promotional data sheet and pricing document is the same information that EPIC has requested. DHS is correct.

The declaration of Peter Kant, Rapiscan's Executive Vice President provides sufficient support for the exemption for two reasons. First, as DHS argues, the public documents that

---

[9]    EPIC submits publicly available information about another Rapiscan product, the WaveScan 200. However, DHS asserts that the WaveScan 200 was not part of the PTIEDD Program and no information concerning it has been withheld. Kant Decl. ¶ 7. Because EPIC does not refute this contention, the court considers it conceded.

EPIC cites contain generic performance information distinct from the specific data included in the document in dispute. *See* Kant Decl. ¶ 4.  For example, while the public document states that the Secure 1000 scanner has a scan rate of "*[l]ess than 7 seconds per view*," according to Kant, the withheld information discloses the precise scan rate that Rapiscan has achieved for purposes of the DHS effort.  *Id*. ¶ 4.  Kant also states that the precise rate is sensitive information that competitors could use to try to undercut Rapiscan's advantage with respect to scan time.  *Id*. Second, according to Kant, the 2009 pricing document contained in the contract with New York State has nothing to do with the pricing under any other contract because Rapiscan's pricing is unique to each procurement.[10]  *Id*. ¶ 5.  Thus, EPIC's contention that the public New York contract price list demonstrates that DHS does not generally treat its unit pricing as confidential falls flat.  Pl.'s Opp. at 16.[11]  The information in the documents that DHS seeks to withhold is "of a kind that the provider would not customarily make available to the public."  *Critical Mass*

---

[10]     Specifically, Kant explains that:

> For any given acquisition, Rapiscan must make competitive business decisions regarding the price that it needs to offer to best enhance its chances of receiving an award. Those judgments are procurement specific. Thus, while the standard commercial price list contained in Exhibit 4 may not be sensitive, the pricing that Rapiscan proposes in a given DHS procurement certainly is, and Rapiscan goes to great lengths to ensure that such  information is kept confidential.

Kant Decl. ¶ 5.

[11]     EPIC also submits a Bloomberg *Businessweek* article that provides an overview of available passenger screening systems.  According to Kant, this does not include any of the information withheld or any other confidential or competitively sensitive information.  Kant Decl. ¶ 6.  The court agrees, and EPIC does not respond to DHS's contention in its reply.

*Energy Project*, 975 F.2d at 872.  Therefore,  viewing the facts in the light most favorable to

EPIC, *Assassination Archives & Research Ctr*, 334 F.3d at 57, the court concludes DHS has met

its burden of showing that it properly invoked Exemption 4.  No material fact is in dispute, and

summary judgment will be entered in the department's favor on this matter.

    **2.**      **DHS's Segregability Analysis of the Records Withheld Under Exemption 4 Is Sufficient**

EPIC also argues that the segregable portions of the requested records should be released.

The court disagrees because DHS's May 31, 2012 segregability analysis and *Vaughn* index

demonstrates that all reasonably segregable material has been disclosed.

Under the FOIA, "even if [the] agency establishes an exemption, it must nonetheless

disclose all reasonably segregable, nonexempt portions of the requested record(s)."  *Roth v. U.S.*

*Dep't of Justice*, 642 F.3d 1161, 1167 (D.C. Cir. 2011) (quoting *Assassination Archives &*

*Research Ctr. v. CIA*, 334 F.3d 55, 57–58 (D.C. Cir. 2003)).  "Any reasonably segregable portion

of a record shall be provided to any person requesting such record after deletion of the portions

which are exempt under this subsection."  5 U.S.C. § 552(b);  *Id.*  However, as stated above,

factual material that is "inextricably intertwined with exempted portions" of the documents need

not be disclosed.  *Johnson v. Exec. Office for U.S. Attorneys*, 310 F.3d 771, 776 (D.C. Cir. 2002)

(citations omitted).

 The government has the "burden of demonstrating that no reasonably segregable

information exists within . . . documents withheld."  *Loving v. Dep't of Defense*, 550 F.3d 32, 41

(D.C. Cir. 2008).  "[T]he withholding agency must supply a relatively detailed justification,

specifically identifying the reasons why a particular exemption is relevant and correlating those

claims with the particular part of a withheld document to which they apply." *King v. U.S. Dep't of Justice*, 830 F.2d 210, 224 (D.C. Cir. 1987) (internal quotations omitted). It must show "with 'reasonable specificity'" why a document cannot be further segregated. *Armstrong v. Executive Office of the President*, 97 F.3d 575, 578–79 (D.C. Cir. 1996). The agency is not required to provide so much detail that the exempt material effectively would be disclosed. *Mead Data*, 566 F.2d at 261. And it need not "commit significant time and resources to the separation of disjointed words, phrases, or even sentences which taken separately or together have minimal or no information content." *Id.*, 566 F.2d at 261 n.55. Rather, it must separate out what is "reasonably segregable," 5 U.S.C. § 552(b), balancing factors such as the burden of line-by-line segregation on the agency and the usefulness of the disclosures to the requester. *See id.* at 261 (explaining that "if only ten percent of the material is non-exempt and it is interspersed line-by-line throughout the document, an agency claim that it is not reasonably segregable because the cost of line-by-line analysis would be high and the result would be an essentially meaningless set of words and phrases[,] might be accepted[.]").

Here, DHS has met its burden. The department's new analysis is "relatively detailed," *King*, 830 F.2d at 224, and discusses with 'reasonable specificity'" why the requested document cannot be further segregated. *Armstrong*, 97 F.3d at 578. In her declaration, Ms. Medina explains, document-by-document and page-by-page, what the contents include and why they could not be produced. For example, she asserts that, in the case of Record 17, a document about Rapiscan complied by DHS employees:

> Pages three through six were redacted in full because they contain
> information deemed to constitute deliberative process and confidential

commercial information. Specifically, the third page, which is a Power Point slide, contains two bullet entries setting forth the strengths and considerations for Rapiscan Systems' development of a non-intrusive explosive detection device. Rapiscan Systems considers this information to be confidential commercial information and it is therefore withheld under exemption 4. This information is not reasonably segregable. The remainder of the third page, as well as the fourth, fifth and sixth page in their entirety, contain a summary of actions Rapiscan Systems is expected to undertake as it performs it contract. The information constitutes the government's deliberative process and it is therefore withheld under exemption 5. Although bits of this information, in the form of sentence fragments or single sentences could be segregated and released, these bits would have minimal or no information context, either separately or taken together. These bits are therefore not reasonably segregable.

EPIC does not challenge the sufficiency of this court-ordered, enhanced segregability analysis, generated after EPIC filed its motion for summary judgment, and the court considers it sufficient.

## B.     DHS Properly Invoked Exemption 5 with Respect to Records 5, 8, and 17

DHS is withholding three records, two in full and one in part, as records protected by the deliberative process privilege under Exemption 5. *Vaughn* Index, Record Nos. 5, 8, 17; Def.'s Mot. Summ. J. at 18-22. According to the *Vaughn* Index, one withheld record consists of minute entries from a preliminary design review meeting during which participants discussed project performance and whether to move to the next phase of the contract. Medina Aug. 2011 Decl. ¶ 22. The other two records are email communications and briefing material regarding NEU and Rapiscan's research efforts and findings. Medina Aug. 2011 Decl. ¶ 22. *Vaughn* Index Docs. Nos. 5, 8, and 17.

Exemption 5 authorizes the withholding of "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  To qualify, a document must satisfy two conditions: (1) its source must be a government agency, and (2) it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it.  *See Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–9 (2001) ("The point is not to protect Government secrecy pure and simple, however, and the first condition of Exemption 5 is no less important than the second; the communication must be 'inter-agency or intra-agency.'"); *Judicial Watch, Inc. v. Department of Energy*, 412 F.3d 125, 129 (D.C. Cir. 2005); *People For The American Way Foundation v. U.S. Dep't of Educ.*, 516 F. Supp. 2d 28, 35 (D.D.C. 2007).  "The threshold issue that must be addressed when Exemption 5 is asserted is whether the records in question qualify as 'inter-agency or intra-agency memorand[a].'" *Physicians Committee For Responsible Medicine v. National Institutes of Health*, 326 F. Supp. 2d 19, 28 (D.D.C. 2004) (quoting *Judicial Watch, Inc. v. U.S. Dep't of Comm.*, 90 F. Supp. 2d 9, 13 (D.D.C. 2000)).  The court therefore first resolves this issue before proceeding to the merits of the Exemption 5 issue.

1.      **Communications Between the Contractors and DHS Are Intra-Agency for FOIA Exemption 5 Purposes**

DHS concedes that Rapiscan and NEU are not federal agencies and that, therefore, the withheld documents are not inter-agency memoranda.  Nevertheless, DHS maintains that the documents are protected under the "consultant corollary" to Exemption 5 because the companies acted as consultants to DHS when they authored the communications at issue.  Under this

exception, "intra-agency" documents can include "agency records containing comments solicited from nongovernmental parties." *McKinley v. Bd. of Governors of the Fed. Reserve Sys.*, 647 F.3d 331, 336  (D.C. Cir. 2011) (citing *Nat'l Inst. of Military Justice v. U.S. Dep't of Defense*, 512 F.3d 677, 680, 682 (D.C. Cir. 2008)).  EPIC contends that the contractors are not entitled to this status because they were acting in their own self-interest.  DHS has the better argument.

When an agency record is submitted by outside consultants as part of the deliberative process, and it was solicited by the agency, the D.C. Circuit has found that it is "entirely reasonable to deem the resulting document to be an 'intra-agency' memorandum for purposes of determining the applicability of Exemption 5." *Nat'l Inst. of Military Justice*, 512 F.3d at 680 (*quoting Ryan v. Dep't of Justice*, 617 F.2d 781, 790 (D.C. Cir. 1980)).  In part, this is because "federal agencies occasionally will encounter problems outside their ken, and it clearly is preferable that they enlist the help of outside experts skilled at unraveling their knotty complexities." *Formaldehyde Inst. v. Dep't of Health and Human Serv.*, 889 F.2d 1118, 1122 (D.C. Cir. 1989) (*quoting CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1162 (D.C. Cir. 1987)).

Here, the relevant question is whether "outside consultants" like NEU and Rapiscan are entitled to such a status.  In *Klamath Water Users*, the U.S. Supreme Court delineated the applicable rule.  *Klamath Water Users*, 532 U.S. at 6.  At issue in that case was a FOIA request submitted to the United States Department of the Interior's Bureau of Indian Affairs seeking disclosure of communications between the Bureau and certain Indian tribes — namely, six documents prepared by tribes at the Bureau's request and one document prepared by the Bureau, all of which related to the allocation of water rights among competing users and uses.  *See id.*

The Court held that the requested documents were not protected from disclosure under Exemption 5, noting that in the "typical" case in which a court applies the consultant corollary, "the consultant does not represent an interest of its own, or the interest of any other client, when it advises the agency that hires it." *Id.* at 11. Instead, the Court held that the consultant's "only obligations are to truth and its sense of what good judgment calls for, and in those respects the consultant functions just as an employee would be expected to do." *Id.* The tribes, by contrast, "necessarily communicate with the Bureau with their own, albeit entirely legitimate, interests in mind." *Id.* at 12. Although that "fact alone distinguishes tribal communications from the consultants' examples recognized by several Courts of Appeals," the Court explained that the "distinction is even sharper, in that the [Indian] Tribes are self-advocates at the expense of others seeking benefits inadequate to satisfy everyone." *Id.* Lest there be any confusion, the Court restated the "dispositive point" — *i.e.* "that the apparent object of the Tribe's communications is a decision by an agency of the Government to support a claim by the Tribe that is necessarily adverse to the interests of competitors." *Id.* at 14.

EPIC argues that Rapiscan and NEU resemble these self-interested *Klamath Water Users* tribes for Exemption 5 purposes. It contends that Rapiscan and NEU, although consulting for and advising DHS, ultimately aspire to win a more lucrative contract to implement the deployment of body scanners — in EPIC's words "the biggest prize: the contract for an actual rollout of this technology in rail stations across the country." Pl.'s Mot. for Summ. J. at 8–9. Therefore, EPIC maintains, "Rapiscan and Northeastern University were communicating with the agency not as independent agents to advance the Department of Homeland Security's

interests, but as self-interested actors intent on selling their product to the agency." *Id.* at 9.  This

posture, according to EPIC, is analogous to that of the *Klamath Water User* tribes who were

acting "with their own, albeit entirely legitimate, interests in mind," and "self-advocates at the

expense of others seeking benefits inadequate to satisfy everyone." *Klamath Water Users*, 532

U.S. at 12.  The court is not persuaded.

EPIC's characterization of the holding *Klamath Water Users* misses the mark.  Self-

advocacy is not a dispositive characteristic and does not control Exemption 5's scope in this

case.  In order to be excluded from the exemption, the contractors must assume a position that is

"necessarily adverse" to the government.  *Id.* at 14.  Even though NEU and Rapiscan's positions

are competitive and self-interested, they are not adverse to DHS, and EPIC has proffered no

evidence suggesting as much.  *See Pub. Emps. for Envtl. Responsibility v. U.S. Section Int'l*

*Boundary & Water Comm'n*, 839 F. Supp. 2d 304 (D.D.C. 2012).  To the contrary, NEU and

Rapiscan are bound in contract to provide information and analysis to DHS.  This relationship

stands in sharp contrast to the tribes in *Klamath Water Users* where the Bureau requested

information from the tribes about water resources who, as the government was well aware,

would take a position  adverse to their competitors and the Bureau.  *Id.* at 14.  The Bureau did

not pay the tribes for the information they proffered or reply upon their neutral advice, much less

enter into a contractual relationship with them in order to obtain it.  This distinction is significant

and forecloses EPIC's proffered analogy.[12]  The court therefore concludes that the documents at

---

[12]        EPIC also attempts to analogize the Rapiscan and NEU contract documents to the
research grant application at issue in *Physicians Committee for Responsible Medicine v. National*
*Institute of Health (NIH)*, 326 F. Supp. 2d 19 (D.D.C. 2004).  In that case, the court held that the

issue were intra-agency communications for Exemptions 5 purposes and proceeds to evaluate

whether or not the records were part of the deliberative process and therefore not subject to

disclosure.

      **2.**      **The Deliberative Process Privilege Applies to the Requested Records**

      To qualify for Exemption 5 protection under the deliberative process privilege, an

agency's materials (including intra-agency records) must be both "predecisional" and a part of

the government's "deliberative process."  *Id.* (quoting *NIMJ*, 512 F.3d at 680 n.4) (internal

citations and quotations omitted)); *accord Pub. Citizen, Inc. v. Office of Mgmt. & Budget*, 598

F.3d 865, 867 (D.C. Cir. 2009).  The scope of the privilege does not turn on whether the contents

of a record are labeled "factual" or "deliberative," but rather on whether the record reflects an

agency's deliberative process.  *Nat'l Wildlife Fed. v. U.S. Forest Serv.*, 861 F.2d 1114, 1119 (9th

Cir. 1988); *see Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1435 (D.C. Cir.

1992) (cautioning "against reflexive fact/opinion characterization as the way to decide the full

range of Exemption 5 cases").  A record is deliberative if "it reflects the give-and-take of the

consultative process."  *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 151 (D.C. Cir. 2006) (quoting

*Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)).  Within this

rubric, courts have found the privilege to cover "documents reflecting advisory opinions,

---

application of a physician to the National Institutes of Health (NIH), which was not exempted
from disclosure under FOIA.  This comparison is not convincing.  The *Physicians Committee*
grant applicant was not acting on the government's behalf when he submitted his application.
He was not a paid contractor or agent.  Instead, he was seeking resources *from* the NIH to
support his research, a personal pursuit.  *Id.* 29.  Here, in contrast, the withheld records were
created after Rapiscan and NEU became paid DHS contactors and assumed a contractual duty to
advise DHS on the development of its body scanner program.

recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975). Factual information must ordinarily be disclosed. *See Petroleum Info. Corp*, 976 F.2d at 1435 (citing *Mink*, 410 U.S. at 87,89 (endorsing fact/opinion distinction). However, even "purely" factual information is protected by the deliberative process privilege when it "is so inextricably intertwined with the deliberative sections of documents that its disclosure would inevitably reveal the government's deliberations." *Citizens for Responsibility and Ethics in Washington (CREW) v. U.S. Dept. of Homeland Sec.*, 514 F. Supp. 2d 36, 46 (D.D.C. 2007); *Judicial Watch, Inc. v. Dep't of Treasury*, 796 F. Supp. 2d 13, 27–28 (D.D.C. 2011) (citing cases).

To meet its burden of justification, a withholding agency must show "by specific and detailed proof that disclosure would defeat, rather than further, the purposes of the FOIA." *Mead Data*, 566 F.2d at 258. It must point to the role in the deliberative process played by each of the documents. *See Judicial Watch, Inc. v. U.S. Postal Serv.*, 297 F. Supp. 2d 252, 259 (D.D.C. 2004) (requiring the agency to identify the role of a contested document in a specific deliberative process to prove that disclosure would defeat the purposes of FOIA). Here, it is undisputed that the documents are predecisional. The parties contest, however, whether the withheld material is deliberative. EPIC argues that DHS has wrongfully withheld "purely factual information." Pl.'s Mot. for Summ. J. at 10. The court will now analyze each entirely withheld record in dispute.

### a.      Record 5

EPIC claims that Record 5, an email from an NEU representative to a DHS official that

"outlines and attaches options related to potential test methodology and technology choices to be

made, as well as the progression to develop concepts of operation for equipment once selected

. . . for Phase II of the BomDetec program," should be disclosed because "the information

contained in this email is *largely* descriptive and factual."  Pl.'s Rep. at 10 (emphasis added).

EPIC argues that such communication is not advice to the department or an opinion; rather, it

relays facts about what the options are and what the process is to develop the proposed concepts.

The court is not persuaded.  Outlining and "attaching options," as well as "choices to be made,"

*id.*, constitutes deliberation and the protected "give and take" of the policy-making process.

*Judicial Watch, Inc.*, 449 F.3d at 151.  Accordingly, DHS's withholding of Record 5 was proper.

### b.      Record 8

EPIC further claims that DHS has also wrongly withheld purely factual information in

Record 8, which is comprised of minutes of a meeting between Rapiscan and DHS officials

describing "options presented to DHS for moving forward with Phase II of system design, a

variety of possible deployment scenarios, and the type of software that may need to be developed

to effectively manage the system effectively."  Pl.'s Mot. for Summ. J. at 21 (quoting Def.'s

Mot. for Summ. J. at 21).  According to EPIC, this document does not detail advisory opinions,

recommendations, or deliberations.  Instead, EPIC asserts, it describes factual details — *i.e.* what

options are available, what deployment scenarios exist, and what the parameters are for

management software.  As a result, EPIC contends, this document is not within the intended

scope of deliberative process privilege.  Once again, the court disagrees.  The discussions

described are deliberative.  As with Record 5, assessment of "possible deployment scenarios"

and scenarios that "may need to be produced" amount to the policy making process that the

privilege protects.  Moreover, such contingent language suggests the agency was deliberating

about its options. These comprise possible next steps that DHS is evaluating.  As such, they are

covered by the exemption and need not be disclosed.

<blockquote>c.      <b>Record 17</b></blockquote>

Similarly, EPIC claims that Record 17, internal briefing materials prepared by DHS in

evaluating the Rapiscan proposal, must be disclosed because it details the "strengths and

weaknesses of the prototype system."  Pl.'s Rep. at 10.  According to DHS, it is the agency's

own assessment of the "strengths and weaknesses of the prototype system and items for [DHS]

to consider before moving forward with further development."  *Vaughn* Index, Record No. 17.

Nevertheless, EPIC contends that this is "exactly the type of factual information that courts

typically find is not protected by the deliberative process privilege."  Pl.'s Mot. for Summ. J. at

21.  Thus, EPIC argues, DHS must disclose what these strengths and weaknesses are.

DHS counters that these records set forth DHS's deliberations about whether to proceed

with Rapiscan's proposal, and the contractors' advice to the agency concerning the ongoing

development of the prototype systems.  The court agrees.  Strength and weaknesses are not

necessarily facts.  Nor are they "straightforward explanations of agency regulations," *Coastal*

*States Gas Corp.*, 617 F.2d at 868, or headers at the top of meeting minutes that courts have

ordered disclosed.  *See id.*  Rather, as represented here, they are the contractors' subjective

assessment of DHS's options.  As such, they form part of the department's deliberative process and fall within the scope of Exemption 5.

In sum, Records 5, 8 and 17 contain deliberative material, the release of which would offend the core policies underlying the deliberative process privilege.  Because the department has met its burden of justifying its non-disclosure of these materials and because no material fact remains in dispute on this issue, the court will enter summary judgment in DHS's favor as to the Exemption 5 withholdings.

### 3. DHS's Segregability Analysis of the Records Withheld Under Exemption 5 Is Adequate

DHS claims that it has disclosed all facts that are "reasonably segregable" from records withheld under Exemption 5.  *See* Medina May 2012 Decl.; 5 U.S.C. § 552(b).   It asserts that, to the extent the records contain "purely" factual information, such information is "inextricably intertwined" with the opinions and deliberations of DHS and its consultants.  Def.'s Mot. for Summ. J. at 1.  As well, because such facts are presented "in the context of recommendations and assessments provided to DHS decision-makers," DHS argues, they are as protected by the deliberative process privilege as the accompanying opinions.  Def.'s Rep. at 7 (citing *CREW*, 514 F. Supp. 2d at 46 (finding reports, timelines, and list of matters developed as part of FEMA's ongoing response to Hurricane Katrina protected); *Bloomberg, L.P. v. SEC*, 357 F. Supp. 2d 156, 169 (D.D.C. 2004) (finding exempt documents that distilled facts from meetings reflecting impressions of agency officials).  For the reasons stated above with respect to documents withheld under Exemption 4, *see supra* at 16–18, and having reviewed DHS's May 2012 segreability analysis of documents withheld under Exemption 5, *see* May 2012 Decl., the court is

persuaded that DHS has disclosed all factual material that is not inextricably intertwined with deliberative portions of the withheld records.  Therefore, no further review or disclosures of factual material are required.  DHS in entitled to summary judgment on the matter of segregability.

**C.      EPIC Is Eligible For And Entitled To Attorney's Fees and Costs**

EPIC argues that it should be awarded attorney's fees and costs by virtue of DHS's release of records after this suit was filed.  It points to the department's disclosure of an additional 151 pages in their entirety and 21 pages in redacted form following the filing of this suit on August 15, 2011.  DHS disagrees, arguing that EPIC is not eligible for or entitled to a fee award because it has not prevailed on a "non insubstantial" claim and has failed to show that the post-filing release of records has benefitted the public or that DHS acted unreasonably in refusing the disclosure certain documents.

The FOIA provides that courts "may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case . . . in which the complainant has substantially prevailed." 5 U.S.C.  § 552(a)(4)(E)(i).  The attorney-fee inquiry is divided into two prongs: fee eligibility and fee entitlement.  *Brayton v. Office of the U.S.  Trade Rep.*, 641 F.3d 521, 524 (D.C.  Cir.  2011).  To be eligible, a plaintiff must "substantially prevail," and, if she has, the court proceeds to the entitlement prong and considers a variety of factors to determine whether the plaintiff should be awarded fees and costs.  *Id.*

1.       **EPIC Meets FOIA's Eligibility Requirement**

"FOIA plaintiffs [are] eligible for a fee award if the lawsuit substantially caused the agency to release the requested records," *Davis v. U.S. Dep't of Justice*, 610 F.3d 750, 752 (D.C. Cir. 2010).  The relief need not be court ordered; "a voluntary or unilateral change in position by the agency," makes a plaintiff eligible "if the complainant's claim is not insubstantial."  5 U.S.C. § 552(a)(4)(E)(ii).

Here, the court finds that EPIC has substantially prevailed.  After the filing of this lawsuit, DHS released five documents that were not scheduled for release for any other reason, such as an already-existing obligation or commitment to disclose the documents.  These post-filing releases occurred in three stages.  First, the department released three additional records that it had refused to release during the administrative process: two that had been withheld in full and one that been withheld in part.  This release occurred "subsequent to the filing of this action" and after a review to "determine whether any additional non-exempt information could be reasonably segregated and disclosed."  Medina August 2011 Decl. ¶ 25.  Next, DHS released reasonably segregable information from three additional records that had been withheld in part. *Id*; Def.'s Statement of Genuine Facts Not in Material Dispute ¶ 14.[13]  Finally, DHS disclosed

---

[13]       In an August 11, 2011 release letter from S&T Attorney/Advisor Marshall Caggianos, DHS represents the following:

>    After further reviews of the DI-IS Science and Technology Directorate (S&T) Explosives Division's responsive records, I have determined that 151 pages of the records are releasable in their entirety, and 21 pages are partially releasable, pursuant to Title 5 U.S.C.  § 552 FOIA Exemption (b)(6).
>    Def.'s Rep., Exh. 3 at 1.

yet another responsive record nearly one year into this litigation after the same record was released in response to a separate lawsuit filed by EPIC.  The sequencing of DHS's disclosures as well as the department's change of position as to the propriety of withholding them suggests that this lawsuit was the catalyst for the record release.  As a result, EPIC is eligible for attorney's fees and costs under the FOIA.

> **2.      EPIC Meets FOIA's Eligibility Requirement for Attorney's Fees**

With respect to the second prong of the attorney's fees analysis, EPIC argues that, in addition to being eligible for attorney's fees, it is entitled to them.  The court agrees.

In determining whether a substantially prevailing FOIA litigant is entitled to attorney's fees, a court must consider "(1) the public benefit derived from the case; (2) the commercial benefit to the plaintiff; (3) the nature of the plaintiff's interest in the records; and (4) the reasonableness of the agency's withholding of the requested documents." *Davy v. CIA*, 550 F.3d 1155, 1159 (D.C. Cir. 2008) (citations omitted).  The second and third factors are often considered together. *Id.* "No one factor is dispositive, although the court will not assess fees when the agency has demonstrated that it had a lawful right to withhold disclosure." *Id.* Accordingly, the court evaluates the released records under each of these tests and balances them.

> **a.      Public Benefit**

In assessing the public benefit derived from the case, the court must consider two factors: (1) the effect of the litigation for which fees are requested, and (2) the potential public value of the information sought. *See id.* (citing *Chesapeake Bay Found. v. USDA*, 108 F.3d 375, 377

(D.C. Cir. 1997); *Cotton v. Heyman*, 63 F.3d 1115, 1120 (D.C. Cir. 1995); *Tax Analysts v. U.S. Dep't of Justice*, 965 F.2d 1095, 1093–94)).  The public-benefit prong "speaks for an award of [attorney's fees] where the complainant's victory is likely to add to the fund of information that citizens may use in making vital political choices."  *Fenster v. Brown*, 617 F.2d 740, 744 (D.C. Cir. 1979) (quoting *Blue v. Bureau of Prisons*, 570 F.2d 529, 534 (5th Cir. 1978)).  EPIC argues that its lawsuit has provided substantial benefit to the public.  DHS counters that the released documents are of little or no public value because news agencies did not cover this particular release.  EPIC has the better argument.

     After the release of the four records in August 2011, EPIC posted the 151 pages as well as a summary of their contents on its website — ostensibly one of EPIC's two "most popular privacy websites in the world"— and in its newsletter to over 8,000 members.  Pl.'s Mot. for Summ. J. at 19.[14]  The explanatory paragraph on the webpage, http://epic.org/2011/08/ documents-reveal-new-details-a.html, dedicated to the record releases states, in full:

> EPIC has obtained more than one hundred fifty pages of documents detailing the Department of Homeland Security's development of mobile body scanners and other crowd surveillance technology.  The documents were obtained as a result of a Freedom Information Act [sic] lawsuit brought by EPIC against the federal agency.  According to the documents obtained by EPIC, vehicles equipped with mobile body scanners are designed to scan crowds and pedestrians on the street and can see through bags, clothing, and even other vehicles.  The documents also reveal that the mobile backscatter machines cannot be American National Standards Institute "certified people scanners" because of the high level of radiation

---

[14]    DHS incorrectly states in its reply that "EPIC's website does not discuss these records or mention their release."  In fact, EPIC lists the active website in its brief: http://epic.org/2011/08/documents-reveal-new-details-a.html.  Instead of following this link, DHS apparently looked to another, related EPIC webpage where it did not find the documents or discussion thereof.

output and because subjects would not know they have been scanned.  For
more information see EPIC: Whole Body Imaging Technology and EPIC:
EPIC v.  DHS (Suspension of the Body Scanner Program).

 DHS unconvincingly claims that "[n]othing in the record or EPIC's assertions suggest

that these latter records have provided any vital information to the public."  Def.'s Rep.  at 10.

To the contrary, this information "adds to the fund" of information about body scanners in public

places that citizens may use in making "vital political choices," *Fenster*, 617 F.2d at 744, about

what level of crowd and pedestrian scanning is acceptable, especially in light of the radiation

exposure and lack of prior notice to scanned subjects.

        In further support of its motion for fees and costs, EPIC points to news coverage of the

controversy surrounding body scanner technology and government contractors.  Specifically,

EPIC maintains that "EPIC's FOIA work in this matter was prominently featured in a *Forbes*

article" and quotes the following excerpt:

> Giving Transportation Security Administration agents a peek under your
> clothes may soon be a practice that goes well beyond airport checkpoints.
> Newly uncovered documents show that as early as 2006, the Department
> of Homeland Security has been planning pilot programs to deploy mobile
> scanning units that can be set up at public events and in train stations,
> along with mobile x-ray vans capable of scanning pedestrians on city
> streets.

Pl.'s Mot. for Summ. J.  at 12.

        EPIC also points to three other publications that carried news of DHS's release of

documents, including *USA Today*, *The Daily Herald*, and *Computerworld*.  As DHS asserts, the

document releases mentioned in those new particles occurred *before* this lawsuit was filed and as

a result of a separate FOIA action filed by EPIC on an earlier date.  That earlier lawsuit also

sought information about the same topic: the development and deployment of body scanners. Because no news articles stemmed directly from the case at bar, DHS contends, EPIC has not demonstrated any public value to the disclosures obtained here.   Although DHS is correct that the cited news articles predate this action, this fact is not fatal to EPIC's claim.   As the media coverage indicates, the *subject matter* contained in the records released as a result of the present action is newsworthy, and the disclosures in this case have added to the body of public knowledge on this issue of public importance.   *Cf. Elec. Privacy Info. Ctr. v. DHS*, 811 F.  Supp. 2d 216, 234 (D.D.C.  2011)  (finding "[t]he [DHS] records [about body scanner technology] disclosed to [EPIC] . . . have provided a public benefit in that they were covered extensively in the news and cited frequently as a news source during the public debate surrounding the use of whole body imaging devices in airports" and citing Jeffrey Rosen, *Why the TSA Pat–Downs and Body Scans are Unconstitutional*, WASH. POST, (Nov.  28, 2010), http://www. washingtonpost. com/wpdyn/content/article/2010/11/24/ x AR 2010112404510.html; Matthew L. Wald, *Mixed Signals on Airport Scanners*, N.Y.  TIMES, (Jan. 12, 2010), http://www.nytimes.com/2010/01/ 13/us/1 scanners.html.).   The court therefore concludes that EPIC has demonstrated a public benefit arising from the disclosed records.   This factor weighs in favor of EPIC's entitlement to attorney's fees and costs.

### b.   Commercial Benefit to the Plaintiff and Nature of the Plaintiff's Interest

"[W]hen a [FOIA] litigant seeks disclosure for a commercial benefit or out of other personal motives, an award of attorney's fees is generally inappropriate." *Tax Analysts v. U.S. Dep't of Justice*, 965 F.2d 1092, 1095 (D.C. Cir. 1992).   Here, EPIC argues that its purpose — to

obtain and disseminate information of interest to the public — is non-commercial and public-oriented and thus favors an award of fees.  The court finds this argument, to which DHS does not respond, persuasive.  Moreover, another court in this district has found that EPIC has non-commercial objectives oriented toward the public interest.  *Elec. Privacy Info. Ctr.*, 811 F. Supp. 2d at 235 ("[EPIC's] aims, which include dissemination of information regarding privacy issues to the public, fall within the scholarly and public-interest oriented goals promoted by FOIA . . . . [T]he 'commercial benefit' and 'nature of interest' elements weigh in favor of granting [EPIC's] motion for attorney's fees.").  This court reaches the same conclusion here.  Therefore, these two factors weigh in favor of granting EPIC a fee award.

### c.  Reasonableness of the Agency's Withholding of the Requested Documents

The final element of the fee entitlement analysis concerns "whether the agency's opposition to disclosure 'had a reasonable basis in law,' and whether the agency 'had not been recalcitrant in its opposition to a valid claim or otherwise engaged in obdurate behavior.'"  *Davy*, 550 F.3d at 1162 (citations omitted).  The government carries the burden of showing that it had a colorable or reasonable basis for not disclosing the material until after the plaintiff filed suit.  *Id.* at 1163.

DHS has not demonstrated as much here.  The department merely asserts that it disclosed the additional records after conducting another round of review.  Critically, these releases came *after* EPIC filed suit.  DHS's purported justification for such disclosure — *i.e.* to "narrow the issues for judicial review" — is not accompanied by any argument as to why the initial withholding had any legal basis.  Def.'s Statement of Genuine Facts Not in Material Dispute ¶

14. The court must therefore conclude that it did not.[15]  In addition, DHS's failure to respond to EPIC's FOIA request by the statutory deadline as well as EPIC's administrative appeal, forced EPIC to commence this action.  This obstructive approach weighs in favor of a fee award.[16]  *See Davy*, 550 F.3d at 1166.  What is more, DHS's failure to provide an adequate segregability analysis, *see* Memorandum Order of May 11, 2012, demonstrates that is has not been forthcoming with the information and analysis that FOIA requires.  Therefore, this factor weighs in favor of EPIC's entitlement to fees and costs.  In sum, considering all of the fee entitlement factors combined, the court finds that EPIC is entitled to attorney's fees and costs.

## IV.  CONCLUSION

For the reasons stated above, the court concludes that DHS's motion for summary judgment should be granted and that EPIC's motion for summary judgment should be denied.  EPIC's motion for attorney's fees and costs should be granted.

An appropriate order accompanies this memorandum opinion this 14th day of September, 2012.

_Barbara J. Rothstein_

_____
BARBARA J.  ROTHSTEIN
UNITED STATES DISTRICT JUDGE

---

[15]     DHS argues EPIC's failure to show that the department acted in bad faith weighs in the department's favor.  DHS is wrong.  As EPIC maintains, an agency must show that its withholding of requested records had a reasonable basis in the law, not merely that it did not withhold in bad faith.  *See Davy*, 550 F.3d at 1162.

[16]     On April 14, 2011, EPIC filed an administrative appeal challenging the S&T's partial withholding of 158 pages of documents and the S&T's complete withholding of 983 pages of documents.  The agency failed to comply with the statutory deadline to reply to this appeal.